TUCKER ELLIS LLP
Brian K. Brookey - SBN 149522
brian.brookey@tuckerellis.com
Anthony D. Brosamle - SBN 208664
anthony.brosamle@tuckerellis.com
Steven E. Lauridsen - SBN 246364
steven.lauridsen@tuckerellis.com
Valeria Golodnitska - SBN 289865
valeria.golodnitska@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:      213.430.3400
Facsimile:      213.430.3409

TUCKER ELLIS LLP
Daniel J. Kelly - SBN 145088
daniel.kelly@tuckerellis.com
201 Mission Street, Suite 2310
San Francisco, CA 94105
Telephone:      415.617.2400
Facsimile:      415.617.2409

Attorneys for Plaintiff,
HILL PHOENIX, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HILL PHOENIX, INC., | Case No. 8:19-cv-00695-DOC (JDEx) |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| CLASSIC REFRIGERATION SOCAL, INC.; THOMAS DAVID LOWE; DAVID ROGERS; and TRAVIS VANDERLOON, | DATE:     March 2, 2020<br>TIME:     8:30 a.m.<br>CTRM:     9D |
| Defendants. | Hon. David O. Carter |

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF FACTS ..................................................................................1

    A.    Background of Hill Phoenix ....................................................................1

    B.    Employee Departures ..............................................................................2

    C.    Defendants' Misappropriation and Misuse of Hill Phoenix
        Trade Secrets and Other Confidential Information ................................2

    D.    History of Litigation ................................................................................3

III.    THE COURT SHOULD GRANT PARTIAL SUMMARY
      JUDGMENT ON HILL PHOENIX'S AFFIRMATIVE CLAIMS...................3

    A.    Hill Phoenix is entitled to summary judgment on its trade
        secret claims............................................................................................3

        1.    Hill Phoenix owns valid trade secrets. ............................................4

        2.    Defendants have misappropriated Hill Phoenix's trade
            secrets through improper means, resulting in damage to
            Hill Phoenix..................................................................................12

    B.    Hill Phoenix is entitled to judgment as a matter of law on its
        breach of contract claim. ......................................................................14

        1.    The employment agreements are valid contracts. .........................15

        2.    Hill Phoenix performed under the contracts. ................................16

        3.    Defendants Rogers and Lowe breached their respective
            agreements.....................................................................................17

        4.    Defendants' breaches damaged Hill Phoenix. ..............................17

IV.     HILL PHOENIX IS ENTITLED TO PARTIAL SUMMARY
      JUDGMENT ON THE COUNTERCLAIMS. .................................................17

    A.    Rogers' labor law claims all fail as a matter of law. .............................17

i

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1. Hill Phoenix did not fail to pay unpaid wages due at the time of Roger's separation pursuant to Cal. Labor Code § 202(a).................................................................................18

    a.    Rogers is not entitled to a bonus under either his contract or his promissory estoppel theories. ..........18

    b.    Rogers is not entitled to a bonus under either the 2014 or 2016 agreement..........................................20

2. No waiting time penalties accrued. ...............................................21

3. Hill Phoenix did not fail to provide accurate wage statements. .......................................................................22

4. The retaliation claim fails as a matter of law because Rogers was not employed when the alleged retaliation took place. ...................................................................22

B. The intentional and negligent interference with economic advantage and claims fail as a matter of law..........................................23

1. The claims are barred by the litigation privilege and the *Noer-Pennington* doctrine..............................................23

2. Classic and Rogers have admitted that they have no evidence that they were damaged by the alleged economic interference. .................................................24

V.    CONCLUSION....................................................................25

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*Abba Rubber Co. v. Seaquist*,
  235 Cal.App.3d 1 (1991) ......................................................................... 6

*Agostini v. Strycula*,
  231 Cal.App.2d 804 (1965) ...................................................................23

*Aguilar v. Int'l Longshoremen's Union Local # 10*,
  966 F.2d 443 (9th Cir. 1991) ................................................................20

*Alderson v. United States*,
  718 F. Supp. 2d 1186 (C.D. Cal. 2010) .................................................. 6

*Armenta v. Osmose, Inc.*,
  135 Cal. App. 4th 314 (2005) ...............................................................22

*Bemis Co., Inc. v. Summers*,
  No. 2:19-cv-344, 2019 WL 1004853 (E.D. Cal. Feb. 28, 2019 ............... 3

*Brocade Commc'n Sys. Inc. v. A10 Networks, Inc.*,
  873 F. Supp. 2d 1192 (N.D. Cal. 2012) .................................................10

*Cortez v. Skol*,
  776 F.3d 1046 (9th Cir. 2015) ..............................................................16

*Courtesy Temp. Serv., Inc. v. Camacho*,
  222 Cal. App. 3d 1278 (1990) ..............................................................12

*DVD Copy Control Assocs., Inc. v. Bunner*,
  116 Cal.App.4th 241 (2004) .................................................................. 7

*Hamilton v. Greenwich Investors XXVI, LLC*,
  195 Cal. App. 4th 1602 (2011) .............................................................14

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) ..............................................6, 10

*Imax Corp. v. Cinema Techs., Inc.*,
  152 F.3d 1161 (9th Cir. 1998) ............................................................... 4

*In re LinkedIn User Privacy Litig.*,
  932 F. Supp. 2d 1089 (N.D. Cal. 2013) .................................................14

*Kashian v. Harriman*,
  98 Cal.App.4th 892 (2002) ...................................................................23

*KLA-Tencor Corp. v. Murphy*,
  717 F. Supp. 2d 895 (N.D. Cal. 2010) .................................................... 3

*Lucian v. All States Trucking Co.*,
116 Cal. App. 3d 972 171 Cal. Rptr. 262 (Ct. App. 1981) ...............................18, 20, 21

*Mai Sys. Corp. v. Peak Computer*,
991 F.2d 511 (9th Cir. 1993) ............................................................................6, 10

*Mattel, Inc. v. MGA Entm't, Inc.*,
782 F.Supp.2d 911 (C.D. Cal. 2011)...........................................................................6

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung*,
No. CV 01-00659, 2001 WL 283083 (C.D. Cal. Feb. 2, 2001) ...........................14

*Mokler v. County of Orange*,
157 Cal.App.4th 121 (2007)....................................................................................22

*Morlife, Inc. v. Perry*,
56 Cal. App. 4th 1514 (1997)....................................................................6, 10, 12

*Muniz v. United Parcel Serv., Inc.*,
731 F. Supp. 2d 961 (N.D. Cal. 2010) ....................................................................22

*Neisendorf v. Levi Strauss & Co.*,
143 Cal. App. 4th 509 (2006).................................................................................20

*Oculus Innovative Scis., Inc. v. Nofil Corp.*,
No. C 06-1686, 2007 WL 4044867 (N.D. Cal. Nov. 15, 2007)....................................14

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
50 Cal. 3d 1118 (1990)............................................................................................23

*Pinder v. Employment Dev. Dep't*,
227 F. Supp. 3d 1123 (E.D. Cal. 2017) ...................................................................22

*Prachasaisoradej v. Ralphs Grocery Co.*,
42 Cal. 4th 217 (2007)............................................................................................18

*Redfearn v. Trader Joe's Co.*,
20 Cal.App.5th 989 (2018)......................................................................................24

*Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.*,
102 Cal. App. 4th 765 (2002)..................................................................................22

*Schachter v. Citigroup, Inc.*,
47 Cal.4th 610 (2009)..............................................................................................18

*Schwarzkopf v. Int'l Bus. Machines, Inc.*,
No. C 08-2715 JF HRL, 2010 WL 1929625 (N.D. Cal. May 12, 2010) ....................19

*Silberg v. Anderson*,
50 Cal.3d 205 (1990)...............................................................................................23

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

iv

*Sun Distributing Co., LLC v. Corbett,*
   No. 18-cv-2231, 2018 WL 4951966 (S.D. Cal. Oct. 12, 2018) .....................12

*United States v. Nosal,*
   844 F.3d 1024 (9th Cir. 2016) (en banc) ............................................6

*Whyte v. Schlage Lock Co.,*
   101 Cal.App.4th 1443 (2002) ........................................................10

**STATUTES**

18 U.S.C. § 1836(b)(1).....................................................................3

18 U.S.C. § 1839 (5)(A)-(B) ..............................................................13

18 U.S.C. § 1839(3)(A)-(B) ...............................................................4

18 U.S.C. § 1839(6) .......................................................................12

Cal. Civ. Code § 3426.1(a) ...............................................................12

Cal. Code Regs. tit. 8, § 13520 .........................................................21

Cal. Code Regs. tit. 8, § 13520(a) ......................................................22

Cal. Lab. Code § 202 .....................................................................18

Cal. Labor Code § 203(a)..................................................................21

California Civil Code § 47 ...............................................................23

Fed.R.Civ.P. 56(a)......................................................................3, 16

**OTHER AUTHORITIES**

Milaram on Trade Secrets § 1.09 ..........................................................6

Prosser, Law of Torts (3d ed. 1964, p. 797..............................................23

Restatement (Third) of Unfair Competition § 39 (1995), cmt. f. ..........................7

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

It is undisputed that Defendants Classic Refrigeration SoCal, Inc. ("Classic"), David Rogers, and David Lowe took trade secret and other confidential information from Plaintiff Hill Phoenix, Inc. ("Hill Phoenix"), and that the individual Defendants breached their contracts with Hill Phoenix. The individual Defendants' primary, if not only, defense to the contract claims is they never signed their contracts with Hill Phoenix at all. This is despite all evidence to the contrary – including Rogers' own prelitigation admission. Hill Phoenix is entitled to partial summary judgment on these claims.

Rogers and Classic also have asserted numerous claims against Hill Phoenix, ranging from breach of a contract Rogers has struggled to identify, to the alleged infliction of emotional distress. As Rogers and Classic have admitted that they have no actual evidence supporting the vast majority of these claims, they are therefore also ripe for summary judgment.

## II.    STATEMENT OF FACTS

### A.    Background of Hill Phoenix

Hill Phoenix traces its origins to 1887 and is a worldwide leader in retail refrigeration systems. Among other things, Hill Phoenix manufactures and sells commercial refrigeration coolers to retailers ranging from small "mom and pop" convenience stores and shops to large national grocery store chains. Hill Phoenix's AMS Group provides aftermarket services, including installing, maintaining, and repairing refrigeration equipment at customer sites. Declaration of John Patterson ("Patterson Decl."), ¶ 2.[1]

In 2016 and 2017, Hill Phoenix selected Defendants Rogers and Lowe to serve as the General Manager and Branch Operations Manager for AMS, respectively. Rogers and Lowe had the highest level of access to confidential, trade secret information, including detailed customer information, maintenance requirements, pricing details, internal work schedules, and compensation structures. Patterson Decl., ¶ 7.

---

[1] The Declaration of John Patterson was filed on April 16, 2019 (Dkt. No. 16-4), with a confidential version filed under seal that same day (Dkt. No. 18-2).

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

**B.     Employee Departures**

On January 3, 2019, Defendant Rogers gave notice that he was leaving Hill Phoenix. His last day at the company was January 18, 2019. At that time, he did not tell Hill Phoenix that he planned to start a competing company. Patterson Decl., ¶ 8.

Unbeknownst to Hill Phoenix at the time, on December 15, 2018—several weeks *before* he notified Hill Phoenix of his resignation—Rogers filed Articles of Organization with the California Secretary of State to create a company named "Tyler Refrigeration SoCal, LLC,"[2] intending to provide commercial refrigeration equipment services in California.

On or about March 4, 2019, David Lowe gave notice that he was resigning, effective March 14. Lowe also did not tell company leadership that he planned to join Rogers' competitor company, and Hill Phoenix remained unaware of the existence of Tyler Refrigeration at that time. Later, however, Lowe admitted he had been involved in setting up the competing company. Patterson Decl., ¶ 10. Classic (the new name for Tyler Refrigeration) remains in business today, staffed almost entirely by former Hill Phoenix employees.  Transcript of January 23, 2020 Deposition of Classic Refrigeration SoCal, Inc. ("Classic Tr."), Ex. 1 to Declaration of Brian K. Brookey ("Brookey Decl.), 152:11-20.

**C.     Defendants' Misappropriation and Misuse of Hill Phoenix Trade Secrets and Other Confidential Information**

On March 21, Hill Phoenix met with a long-time customer, which informed Hill Phoenix that Rogers and Classic officer Danny Lamping had solicited work from it, and that it had agreed to take business away from Hill Phoenix and allow the new company to bid for it. Rogers and Lamping had worked with this customer while at Hill Phoenix, and therefore had knowledge of secret information such as pricing structures, history of service calls, customer preferences, and even the cell phone numbers of decision-makers, which are not publicly available. Patterson Decl., ¶ 12.

---

[2] The company was later converted to a corporation known as "Tyler Refrigeration SoCal, Inc." *Id.*, Ex. 2.

As explained in more detail below, Defendants took and misused other trade secret and confidential information relating to Hill Phoenix, including a contact list containing non-readily available information (such as personal cell phone numbers) regarding Hill Phoenix's customer database. *See* Patterson Decl., ¶ 19.

### D.   History of Litigation

Hill Phoenix filed this action on April 12, 2019, and obtained a temporary restraining order against Defendants on April 23. The Court later appointed a Special Master to determine whether Defendants had complied with the temporary restraining order. On September 20, 2019, Hill Phoenix filed an amended complaint. Defendants answered on October 4, including 41 affirmative defenses and counterclaims ranging from intentional infliction of emotional distress to alleged failure to pay Rogers a purported bonus. Hill Phoenix is entitled to summary judgment on each.

## III.   THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT ON HILL PHOENIX'S AFFIRMATIVE CLAIMS.

A Court may enter summary judgment, or partial summary judgment, where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). That is exactly the case here.

### A.   Hill Phoenix is entitled to summary judgment on its trade secret claims.

The Defend Trade Secrets Act ("DTSA") provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *See* 18 U.S.C. § 1836(b)(1). "A prima facie claim for misappropriation of trade secrets requires the plaintiff to show: (1) it owned a trade secret, (2) the defendant acquired, disclosed, or used the trade secret through improper means, and (3) the defendant's actions damages plaintiff." *Bemis Co., Inc. v. Summers*, No. 2:19-cv-344, 2019 WL 1004853, at *3 (E.D. Cal. Feb. 28, 2019) (citing *KLA-Tencor Corp. v. Murphy*, 717 F. Supp. 2d 895, 906 (N.D. Cal. 2010)). The elements for violations of the California Uniform Trade Secrets Act are substantively identical. There is no genuine issue of fact with respect to any of these elements.

### 1. Hill Phoenix owns valid trade secrets.

A trade secret includes any forms of technical, scientific, or engineering information, including formulas, designs, methods, techniques, processes, and procedures that the owner has taken reasonable measures to keep secret and that derives independent economic value, whether actual or potential, from not being generally known. 18 U.S.C. § 1839(3)(A)-(B). The plaintiff "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (citation and alteration omitted; emphasis in original).

Defendant Lowe took with him after departing Hill Phoenix his entire business contact list, and he and the other Defendants used that list to solicit Hill Phoenix customers and employees. The contact list—comprising over 1,500 entries—was developed over years of work and relationship building. The customer information included such details as specific names of individuals at actual and prospective customers, and those individuals' cell phone numbers. This type of information is not public and could not be obtained by a competitor without that competitor working on the list for years. Patterson Decl., ¶ 15.

Additionally, as he was preparing to leave Hill Phoenix, Lowe frequently would insert into his computer an external storage device, and then open up files containing confidential information. On the same day he was finalizing his resignation letter, and with his thumb drive inserted into his computer, Lowe opened nearly three dozen files that included information regarding training, equipment, pricing, and employee salaries.[3] Patterson Decl., ¶¶ 20-21.

Hill Phoenix has identified numerous trade secrets Defendants took, six of which were at issue at the temporary restraining order stage and for purposes of this motion:

1. A customer list comprising over 1,500 entries and including such details as

---

[3] Details regarding the forensic analyses performed on the individual Defendants' devices are set forth in the Declaration of James D. Vaughn.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

specific names of individuals at actual and prospective customers and those individuals' cell phone numbers. Patterson Decl., ¶¶ 17-18 & Ex. 6 (Dkt. 16-4, 34).

2. A Customer Master Location List including detailed information about specific stores within major chains that Hill Phoenix services, including addresses and telephone numbers, something that would take at least a year to create. Supplemental Declaration of John Patterson ("Supp. Patterson Decl. "), ¶ 4 & Ex. 1 (Dkt. 44, 45, 49).

3. A Wage Matrix with confidential wage and hour and margin information. *Id.* at ¶¶ 5-6 & Ex. 2.

4. A Contract Sales/Change Order with very detailed pricing information for an important customer. *Id.*

5. Documents comprising very detailed job costing templates, including cost, pricing, wage, and margin information. *Id.* at ¶ 7 & Exs. 3-4.

6. A document titled "Installation Proposal/Contract," which contains highly confidential, trade secret information regarding a bid for work on a project for a Hill Phoenix customer. This document includes a description of the scope of work and the total price. *Id.* at ¶ 8 & Ex. 5.

Defendants do not dispute that they took these materials. *See*, *e.g.*, Special Master's Report and Recommendation No. 2, Dkt. No. 94, pp. 6-9. There is independent economic value to keeping secret these types of company information. Specifically, information regarding customer identities and preferences, cell phone numbers, and pricing, could be used to Hill Phoenix's detriment by a competitor if that information became publicly known. Without pilfering Hill Phoenix's customer list, Defendants would have needed to engage in the lengthy work of "cold calling" prospective customers. With the list, they were able to benefit from the decades of work by Hill Phoenix and its predecessor without putting in any work themselves. *See* Patterson Decl., ¶ 23.

Similarly, Hill Phoenix keeps information regarding employee salaries, benefits, and

schedules secret. A competitor with knowledge of that type of information could harm Hill Phoenix by using it to lure away valuable employees with the promise of higher salaries, increased benefits, and/or more hours. *Id.*

Hill Phoenix's customer information, which Defendants misappropriated and are using to solicit customers, is the classic example of a trade secret. "[C]ourts have deemed customer lists protectable trade secrets." *United States v. Nosal*, 844 F.3d 1024, 1043 (9th Cir. 2016) (en banc); *Alderson v. United States*, 718 F. Supp. 2d 1186, 1199 (C.D. Cal. 2010) ("Generally speaking, the law of trade secrets protects customer lists") (citing 1-1 Milaram on Trade Secrets § 1.09); *Abba Rubber Co. v. Seaquist*, 235 Cal.App.3d 1, 18 (1991) ("A customer list is one of the types of information which can qualify as a trade secret.") (citations omitted). And courts have held that customer lists have potential or actual economic value from not being generally known to the public: information about customers' preferences can aid in "securing and retaining their business." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F.Supp.2d 911, 972 (C.D. Cal. 2011) (citing *Aetna Bldg. Maintenance Co. v. West*, 39 Cal.2d 198, 205 (1952)); *Mai Sys. Corp. v. Peak Computer*, 991 F.2d 511, 521 (9th Cir. 1993) ("The Customer Database has potential economic value because it allows a competitor like Peak to direct its sales efforts to those potential customers that are already using the MAI computer system."); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets"); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997) ("[A] customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested.") (citation omitted). Hill Phoenix's customer list is not a compendium of readily available information. Instead, it reflects many years of work building relationships and trust. It identifies not just customers, but individuals within those customers. It identifies not just public phone numbers, but private cell phone numbers.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

During this litigation, Defendants have raised various arguments as to why the trade secrets enumerated above should not be treated as such. First, Defendants assert that the customer contacts list is publicly available, claiming that all one has to do is cold call a potential customer and then perform some follow up on LinkedIn to find the correct contact person's cell phone number. Leaving aside the issue that those contact people would be bombarded with cold calls if this were true, Defendants proffered no documentary evidence to support this assertion.[4] Difficulty in amassing this information satisfies the secrecy requirement under the law. Restatement (Third) of Unfair Competition § 39 (1995), cmt. f. ("the requirement of secrecy is satisfied if it would be difficult or costly for others who could exploit the information to acquire it without resort to the wrongful conduct proscribed under" the law).

Second, with respect to Defendants' assertion that wage information is publicly available via various trade unions, this claim obfuscates the real truth. While the schedule of union wages is publicly available, it is a floor and not a set amount, thus allowing different competitors to add a confidential margin to the wage to set the workers' pay, which in turn affects each competitor's overall bid, a fact Defendants cannot dispute. Transcript of May 4, 2019 Deposition of Paul Panzarella, Ex. 2 to Brookey Decl. and Dkt. No. 72, Ex. 3 ("Panzarella Tr.") 21:5-13, 21:22-24:6, 56:5-24; Transcript of May 6, 2019 Deposition of Thomas David Lowe, Ex. 3 to Brookey Decl. and Dkt. No. 72, Ex. 2 ("Lowe Tr.") 53:13-55:7. In fact, when Classic employee Panzarella was asked about this salary at deposition, his attorney objected that the information was "confidential" and instructed him not to respond. Panzarella Tr. 19:21-25; *see also id.* at 20:11-23 (confidentiality objections concerning questions about Panzarella's base hourly pay as set by his union).

Third, turning to cost-pricing, wage, and margin information, there is no real dispute as to whether this information constitutes trade secrets. When asked about the amount of

---

[4] Even if some of the contact information were available scattered across the Internet, that does not destroy its secret nature. *See DVD Copy Control Assocs., Inc. v. Bunner*, 116 Cal.App.4th 241, 251 (2004) (existence of information on the Internet does not destroy the secrecy of that information unless it becomes generally known to relevant people). As discussed below, it would take years for a competitor to compile this information.

revenue Classic had earned from companies with which Rogers had worked while at Hill Phoenix, Rogers refused to answer, testifying: "I don't have the financial details ***and there's a competitor in the room.***" Transcript of May 7, 2019 Deposition of David Rogers, Ex. 4 to Brookey Decl. and Dkt. No. 72, Ex. 1 ("Rogers Tr. I") 214:2-19 (emphasis added). Similarly, throughout his deposition testimony, Lowe affirmed that margin information not only was considered a trade secret at Hill Phoenix, but that Classic views it the same way:

> Q.    You -- you said that the margin information is -- is something that you defined as a trade secret in terms of your business; correct?
>
> A.    I feel it is, yeah.
>
> Q.    And when you were at Hill Phoenix, you understood the margin information was something Hill Phoenix considered a trade secret as well; right?
>
> A.    Uh-huh.
>
> Q.    I'm sorry?
>
> A.    Yes. I'm sorry.

Lowe Tr. 49:23-50:8; *see also id*. at 55:4-7; see also Rogers Tr. I 158:24-25 (Q: "Do you consider that information [how much Classic has been paid by its customers] private?" A: "I do."). In fact, when asked about Defendant Classic's margin information, including modifications to the union wage schedule, Lowe's own attorney objected that such information was a trade secret:

> A: I used the ARCA/MCA wage schedule, local 250 wage schedule for local work, and local 342 up in Northern California for Northern California work, put a margin on it, and send it to her.
>
> Q: What margin did you put on it?
>
> MR. HOFFMAN: Objection. ***Calls for trade secret information***.

Lowe Tr. 44:16-25 (emphasis added); *see also id.* at 47:17-25, 50:2-8. When asked for clarification, Lowe again conceded that not only was the margin information a trade secret, but that it also had independent economic value:

8

Q.      I just want to seek clarification of what you meant. When you say you can't answer, is that because you don't know or because you won't answer?

A.      I don't think it's right to answer, and give our margins. Our margins, our trade secrets, too, and I'm being accused of taking trade secrets.

Q.      When you say your margins or trade secrets, what do you mean when you -- when you use the term "trade secrets"?

A.      It's what we need to make our business run.

Lowe Tr. 48:13-23 (emphasis added).

Lowe also admitted that the change order that Defendants misappropriated contained detailed cost information, something that would not otherwise be available. Lowe Tr. 144:9-11.

And when asked about the Installation Proposal/Contract, Defendants admitted that the information should be kept confidential from a competitor. Panzarella Tr. 165:10-14; *see also id.* at 169:23-171:12. All of the above information goes into formulating a bid, something that Defendants also once again agree is confidential/trade secret. *See, e.g.,* Panzarella Tr. 58:18-60:16, 124:7-127:21 (stating would not share bid information with a competitor and agreeing it would not be okay for Classic to use Hill Phoenix information to create a bid for a customer); Rogers Tr. I 163:9-166:10 (discussing need to keep bids private, including for customer's sake); Lowe Tr. 147:7-24 (wage matrix with wage and hour and market information confidential, as well as pricing information); Lowe Tr. 42:2-11 (discussing the importance of not using Hill Phoenix information in preparing a bid for a Hill Phoenix customer); Rogers Tr. I 158:6- 25 (claiming amount paid to Classic by customers is confidential).

This makes sense, particularly given Defendants' admission that a bid, and thus the information contained therein, could be used by a competitor to undermine another competitor's business. Lowe Tr. 188:14-25; *see also* Rogers Tr. I 163:9-166:10 (discussing need to keep bids private, including for customer's sake).

If information that a competitor can use against a business is not the hallmark of

9

independent economic value, it is hard to imagine what is. Courts have repeatedly found that such information that would give a competitive advantage to constitute trade secrets. *Henry Schein, Inc. v. Cook*, No. 16-03166C, 2016 WL 3418537, at *4 (N.D. Cal. June 22, 2016) (holding customer information, margins, and profit percentages used to gain an advantage over competitors were protectable as trade secrets); *Brocade Commc'n Sys. Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012) ("[C]ustomer-related information including ... pricing guidelines ... and customers' business needs/preferences ... is routinely given trade secret protection."); *Mai Sys. Corp. v. Peak Computer*, 991 F.2d 511, 521 (9th Cir. 1993) ("The Customer Database has potential economic value because it allows a competitor like Peak to direct its sales efforts to those potential customers that are already using the MAI computer system."); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets"); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997) ("[A] customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested.") (citation omitted); *Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 1455–56 (2002) (costs and pricing information can be shown to derive independent economic value and thus be trade secrets). Given Defendants admissions, Hill Phoenix has met its burden to show both that its alleged trade secrets are both confidential and that they derive independent economic value from not being known.

Hill Phoenix takes significant measures to protect the secrecy of its corporate information, including customer lists. The company keeps that information on secure password-protected computer systems, only allows the transmission of those data through secure and encrypted means, only provides confidential information to employees who have a need to access it, and requires that employees sign confidentiality agreements that specifically prohibit the dissemination of customer lists and other trade secrets. Moreover, Hill Phoenix's facilities are accessed by using electronic key fobs. Hard copies of

information meant to be kept confidential are kept in locked filing cabinets, and/or in locked offices or cubicles. Patterson Decl., ¶¶ 24. Finally, Defendants Rogers and Lowe each expressly agreed in writing to conform to the Code of Business Conduct and Ethics of parent company Dover Corporation. Patterson Decl., ¶ 17 and Exs. 3-5. Among other things, the Code of Conduct provides that:

- Employees must use computers, phones, and other business equipment for business purposes;
- Employees must password-protect or encrypt sensitive or vulnerable information when that information is sent electronically;
- Employees must protect confidential information, which includes any nonpublic information that if revealed might benefit competitors or harm Dover (including its affiliates) and
- Confidential information only may be disclosed to third parties with a legitimate need to know it (or where such disclosure is legally required), and then only following safeguards to protect the information from misuse.[5]

Similarly, each of the individual Defendants' employment agreements mandated that they would not use or disclose to any third party or entity "the names, buying habits, or practices of any of HP's customers . . . ." Patterson Decl., Ex. 3-4.

Defendants and their employees have admitted that Hill Phoenix took these measures to protect its information. *See*, *e.g.*, Panzarella Tr. 160:14-16 (field laptops were not permitted to connect to the network drive at Hill Phoenix), 168:16-169:3 (admitting there were specific security protocols surrounding the use of computers, including thumb drives, and that such measures were considered important); Lowe Tr. 169:13-173:15 & Ex. 13 (discussing numerous trainings required by Hill Phoenix, including on confidentiality); Rogers Tr. I 98:24-101:16, 112:2-113:11 & Dep. Ex. 27, 119:2-122:14.

These types of measures generally constitute sufficient steps to protect a trade secret.

---

[5] The complete Code of Business Conduct and Ethics can be found at https://www.dovercorporation.com/about-us/our-governance/. Copies of relevant pages are attached as Exhibit D to Hill Phoenix's amended complaint.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

*See, e.g., Morlife*, 56 Cal.App.4th at 1523 (finding reasonable measures where customer list was stored on a computer with restricted access and company instructed employees to maintain confidentiality); *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (finding reasonable measures where customer list was distributed to employees on an "as needed basis" and employees were directed to keep it confidential).

Finally, the Special Master agreed with Hill Phoenix that all six of the trade secrets identified above, along with approximately 30 other documents, "potentially qualify as confidential, commercially sensitive, and/or trade secret information." Scheduling and Procedure Order No. 2 Re: TRO Compliance Procedure, Dkt. No. 87, at 1:12-15 and Ex. A.[6] Defendants have offered no evidence or argument since then to rebut the confidential or trade secret nature of those, or any other, documents.

### 2. Defendants have misappropriated Hill Phoenix's trade secrets through improper means, resulting in damage to Hill Phoenix.

Misappropriation is defined in pertinent part as the (1) acquisition, (2) disclosure, or (3) use of a trade secret through improper means. *See* 18 U.S.C. § 1839(5)(A)–(B). "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6); Cal. Civ. Code § 3426.1(a).

As employees, each of the individual Defendants had both a contractual and legal duty to maintain the secrecy of Hill Phoenix's trade secrets, including its customer list. Courts have held that violating these duties – which Defendants cannot dispute here— constitutes misappropriation *See, e.g., Sun Distributing Co., LLC v. Corbett*, No. 18-cv-2231, 2018 WL 4951966 (S.D. Cal. Oct. 12, 2018) ("As Plaintiff's general manager, Defendant had a duty to maintain the secrecy of the information even after he left

---

[6] The Special Master later noted that it is possible that his list of 36 potentially trade secret and confidential items may be narrowed through further litigation. Dkt. No. 94, at 5:1-6. However, he never specified which of those documents might not be confidential or trade secret after all, nor did he compare them to the definition of "confidential" as defined by the parties' agreements. Therefore, to the extent the Special Master's opinion is relevant here at all, his prima facie finding stands.

the company. Defendant knew the information Mr. Mantis provided was a trade secret and he was under a duty not to use that information").

Moreover, Defendant Classic is liable for improperly acquiring these trade secrets because it knew that the individual Defendants acquired the trade secret information through improper means. *Id.*; *see also* 18 U.S.C. § 1839 (5)(A)-(B) (misappropriation includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" as well as use of a trade secret where a person "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret").

Defendants Lowe and other Classic employees all admit to having taken Hill Phoenix's Master Customer List, Installation Proposal Contract, and a change order, respectively. Lowe Tr. 132:12-20; Panzarella Dep. 134:6-18, 135:20-136:16; Declaration of Renee Israelson, Dkt. No. 57-8 ("Israelson Decl.") ¶¶ 11-12. Defendants acknowledge the change order Renee Israelson took contained confidential information. Israelson Decl. ¶ 11; Lowe Tr. 144:9-11.

Defendant Lowe also does not dispute that, on the day he finalized his resignation letter, he accessed dozens of files on training, equipment, pricing, and employee salaries while a thumb drive was plugged into his computer. Lowe Tr. 136:11-137:4. Although Lowe states he merely accessed these files for his job duties while a thumb drive was plugged in for other purposes, he does not explain why he needed this diverse array of files on a single day. *See id*.

And with respect to Classic, it has received all of the above information through its employees, which is in itself a violation of the law. *See Sun Distributing Co., LLC v. Corbett*, No. 18-cv-2231, 2018 WL 4951966, at *6 (S.D. Cal. Oct. 12, 2018); *see also* 18 U.S.C. § 1839 (5)(A)-(B) (misappropriation includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" as well as use of a trade secret where a person "at the time of disclosure

or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret").

The undisputed facts show that Hill Phoenix owns valid, protectable trade secrets that Defendants misappropriated, and Hill Phoenix therefore is entitled to judgment.

## B. Hill Phoenix is entitled to judgment as a matter of law on its breach of contract claim.

To prevail on a claim for breach of contract, Hill Phoenix must prove: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach. *In re LinkedIn User Privacy Litig.*, 932 F. Supp. 2d 1089, 1094 (N.D. Cal. 2013) (citing *Hamilton v. Greenwich Investors XXVI, LLC*, 195 Cal. App. 4th 1602, 1614 (2011)). Breach of confidentiality agreements, data usage agreements, and non-disclosure agreements are appropriate subjects for a breach of contract claim. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung*, No. CV 01-00659, 2001 WL 283083, at *1 (C.D. Cal. Feb. 2, 2001); *Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. C 06-1686, 2007 WL 4044867, at *3 (N.D. Cal. Nov. 15, 2007).

Here, the individual Defendants entered into valid agreements with Hill Phoenix in which they agreed to refrain from disclosing any trade secrets or other confidential materials. "Confidential information" is defined specifically in their agreements as:

[I]nformation which is of value to HP because it is not generally known in the industry, and includes, but is not limited to, such information related to: (a) the tooling, equipment, and choice of machinery involved in the manufacturing of systems; (b) scientific and technical formulation, ideas, discoveries, designs, improvements, processes, procedures, software, and formulas; (c) the names, buying habits, or practices of any of HP's customers; (d) HP's marketing methods, business plans and related data; (e) the names of any of HP's vendors or suppliers; (f) the costs, prices, or discounts HP obtains or has obtained or at which it sells or has sold its products or services; (g)

14

compensation paid to employees or other terms of employment; and (h) all other know-how and other such information not generally known to the public.

Patterson Decl., Exs. 3-4. These agreements also required the individual Defendants to keep confidential and not misuse Hill Phoenix's trade secrets, the definition of which closely tracks that in the DTSA. *Id.*

Information that does not rise to the level of a trade secret is still subject to the confidentiality obligations imposed by the individual Defendants' contracts with Hill Phoenix. Each of those Defendants agreed in advance that they would keep secret the exact type of information they took with them and disclosed are using in forming their new company. Hill Phoenix fulfilled its contractual obligations, but the individual Defendants did not reciprocate.

### 1.     The employment agreements are valid contracts.

With no defense to the claims for breach of contract, Rogers and Lowe argue that they never signed their 2016 employment agreements at all. This theory runs contrary to all evidence. Hill Phoenix has produced in discovery as a native file an August 2, 2016 email from Rogers to Hill Phoenix to which he attaches his signed offer letter and employment agreement. Declaration of Mario Burt ("Burt Decl."), ¶¶ 3-4 and Ex. 1. Earlier in this email chain, Rogers inquired whether a DocuSign signature would suffice, and was assured it would. A DocuSign certificate confirms that Rogers signed his agreement on August 2, 2016 at 10:25 p.m., a few minutes before Rogers emailed the agreement back to Hill Phoenix. Second Supplemental Declaration of John Patterson, Dkt. No. 65, Ex. 5. A DocuSign certificate similarly confirms that Lowe signed his agreement. *Id.*, Ex. 7.

Despite this overwhelming and uncontroverted evidence, Rogers continues to insist that he did not sign the document he e-mailed to Hill Phoenix, and Lowe says he does not remember signing. At deposition, neither Rogers nor Lowe could offer an explanation as to how emails sent from their designed company accounts that attached their signed employment agreements were actually not sent by them.

Rogers in particular could not—or at times would not— provide any explanation for this bizarre position. Rogers Tr. I 131:2-133:23, 278:11-20, 279:12-281:21, 284:4- 13, 293:13-294:8. For example: Despite claiming the document had been forged, when asked why Rogers did not raise the issue earlier, he just repeated that he had "no comment." *Id.* at 285:4-23, 285:4-23. Other times, his attorney instructed him not to answer at all. *Id.* at 290:23-291:16. Confronted just recently with a printout of the native version of the e-mail and attachment, Rogers finally had concede that he had no facts to support his denial that this exchange occurred. Transcript of January 22, 2020 Deposition of David Rogers, Ex. 5 to Brookey Decl. ("Rogers Tr. II") 190:3-23, 192:10-194:5.

Additionally, on April 4, 2019, Rogers' lawyer Mahyar Ghassemian sent a letter to Paul Sindoni, President of Hill Phoenix, asserting certain claims against Hill Phoenix. In this letter, Rogers, through his attorney, alleged that he was employed by Hill Phoenix "pursuant to" the July 2016 agreement. Declaration of Paul Sindoni ("Sindoni Decl."), ¶ 17 and Ex. 4. [7]

To defeat a motion for summary judgment, Defendants must show that there is a ***genuine*** issue of material fact. Fed.R.Civ.P. 56(a). "'An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.'" *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015) (quotation omitted). The uncontroverted evidence demonstrates that Defendants each signed their agreements, and no reasonable jury could ever find to the contrary.

### 2.   Hill Phoenix performed under the contracts.

It is undisputed that Hill Phoenix performed under its contracts with Lowe and Rogers, having employed them pursuant to the terms set forth this those agreements and having paid them their annual salaries. *See*, *e.g.*, Answer and Counterclaim, Dkt. No. 104, at p. 29 ¶¶ 10-13. Defendants have never disputed Hill Phoenix's performance under their

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

---

[7] Although the letter purports to be a settlement communication, it was in reality a demand letter that was not in the context of any "compromise negotiations." As a result, Rule 408 of the Federal Rules of Evidence has no bearing on the admissibility of Rogers' admission. Nonetheless, the version submitted to the Court has been redacted to eliminate Rogers' unilateral demand.

2016 employment agreements, relying instead on the false claim that those agreements never existed.[8]

### 3. Defendants Rogers and Lowe breached their respective agreements.

Defendants and their employees understood they had a duty to protect Hill Phoenix's trade secret and confidential information. *See*, *e.g.*, Panzarella Tr. 34:12-35:11; Lowe Tr. 76:11-78:24, 82:2-18, 108:15-109:20 (agreeing to keep information confidential). Despite this fact, Defendants misappropriated Hill Phoenix's information, as discussed in detail above. Even if that information does not rise to the level of a trade secret, as Defendants argue, it unquestionably qualifies as "confidential" under the parties' employment agreements. *See* Patterson Decl. Exs. 3-4. Thus, by taking, maintaining, and using that information, each of the individual Defendants is in breach of those contracts, and summary judgment is warranted.

### 4. Defendants' breaches damaged Hill Phoenix.

It is undisputed that Defendants took from Hill Phoenix information that was confidential at the very least, and in several respects trade secret. This gave them a head start in operating their competing business, to Hill Phoenix's detriment. And their breaches caused Hill Phoenix to incur attorneys' fees and lost time seeking vindication of its rights. Sindoni Decl, ¶ 18. That the breaches harmed Hill Phoenix is, again, not in dispute.

## IV. HILL PHOENIX IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE COUNTERCLAIMS.

### A. Rogers' labor law claims all fail as a matter of law.

Rogers' labor law claims are predicated on his allegation that he did not receive a discretionary bonus after he left Hill Phoenix. The undisputed facts, however, show that Rogers was never entitled to a bonus, and Hill Phoenix is therefore entitled to judgment as a matter of law on each of these claims.

---

[8] As explained below, Rogers' only contractual theory is that Hill Phoenix supposedly breached a different alleged contract, after the breaches of the 2016 agreement that are asserted against him.

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

**1.    Hill Phoenix did not fail to pay unpaid wages due at the time of Roger's separation pursuant to Cal. Labor Code § 202(a).**

Rogers' counterclaim for failure to pay wages due is premised on an allegedly earned bonus per an alleged written agreement under Hill Phoenix's Annual Incentive Plan ("AIP"). Remarkably, when Rogers was asked at deposition to identify the contract he believes Hill Phoenix breached, his counsel instructed him not to answer. Eventually, Rogers admitted he did not know pursuant to what agreement he was suing. Rogers Tr. II 123:18-125:14, 125:25-126:3, 127:1-10. Rogers appears finally to have landed on the theory that his bonus is based on a "written agreement" comprising an AIP calculation spreadsheet that he prepared himself. Regardless of how often he changes his factual assertions and legal theories, he is not "entitled" to a bonus.

"If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter . . . ." Cal. Lab. Code § 202. However, "numerous California cases have held that, where the parties so understand and agree, final compensation, or at least a portion thereof, may be contingent on events that occur after the employee has performed service . . . ." *Prachasaisoradej v. Ralphs Grocery Co.*, 42 Cal. 4th 217, 239 (2007). "Thus, an employee who voluntarily leaves his employment before the bonus calculation date is not entitled to receive it." *Lucian v. All States Trucking Co.*, 116 Cal. App. 3d 972, 975, 171 Cal. Rptr. 262 (Ct. App. 1981); *see also Schachter v. Citigroup, Inc.*, 47 Cal.4th 610, 621 (2009) (employee who voluntarily left employment early was not entitled to pro rata share of "incentive compensation . . . because he failed to perform the condition necessary to do so—in this case, remain employed with the company until two years had passed from the date he received the restricted stock").

**a.    Rogers is not entitled to a bonus under either his contract or his promissory estoppel theories.**

In his counterclaim, Rogers argues that Mr. Sindoni sent him an AIP spreadsheet attached to the pleading as Exhibit C by Mr. Sindoni. Answer and Counterclaim (Dkt. No.

104), at p. 29 ¶ 13. At deposition Rogers admitted that this was false. Instead, the document allegedly supporting his claim was one that *Rogers himself prepared* – and not one that Hill Phoenix provided him. Rogers Tr. II at 203:20-206:12, 207:1-208:5, 209:2-211:22. Thus, the falsity of the basis for Rogers' counterclaim on the bonus issue is undisputed, which is reason enough to grant partial summary judgment on that issue.

The truth is that under the AIP process, Mr. Sindoni sent Rogers a template AIP spreadsheet for goals of the year, which was one part of an overall process in determining the amount of a discretionary bonus that potentially, after weighing numerous factors, might have been provided to Rogers. Rogers sent Mr. Sindoni his self-assessment of both objective and subjective factors. *See id*.; *see also*, Sindoni Decl., ¶¶ 4-14 and Exs. 1-2. In essence, it shows the bonus he was *requesting* – not one he was promised.

Additionally, Rogers gave notice the same day he provided Mr. Sindoni with his self-assessment. Thus, his AIP never went through the discretionary bonus process, and no bonus amount was approved. Once the financials were in place for the previous year, Mr. Sindoni did determine the amount of a discretionary bonus that Rogers might have received if he had stayed at the company. It was important to Hill Phoenix that Rogers comply with his obligations, including those regarding confidentiality and trade secret protection. For that reason, and in the hope that Hill Phoenix could remain on good terms with Rogers, Mr. Sindoni decided to offer Rogers the equivalent of what his potential discretionary bonus might have been, so long as Rogers re-affirmed that he would comply with his obligations. Rogers refused this offer. Sindoni Decl., ¶¶ 15-17 and Exs. 3-4.

"[C]ontract formation [concerning bonuses] does not occur when an employer retains absolute discretion or a unilateral right to modify or cancel employee commission." *Schwarzkopf v. Int'l Bus. Machines, Inc.*, No. C 08-2715 JF HRL, 2010 WL 1929625, at *8 (N.D. Cal. May 12, 2010) At no point during his employment was Rogers' 2018 bonus calculated and finalized. Instead, only the first step, an AIP self-evaluation, had been performed when Rogers left the company. As a result, his bonus had not yet been calculated and finalized, and Hill Phoenix had discretion to adjust the bonus downward, even to zero

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

dollars. Simply put, no binding agreement was created by Rogers submitting his proposed AIP calculations, and he therefore was not entitled to a 2018 bonus. There was no contract at all promising Rogers an automatic, guaranteed bonus. Nor did Hill Phoenix make any other promise regarding Rogers' purported bonus, much less one on which Rogers reasonably could have relied. *See Aguilar v. Int'l Longshoremen's Union Local # 10*, 966 F.2d 443, 444 (9th Cir. 1991) (promissory estoppel requires, among other things, proof of a promise on which plaintiff reasonably relied). Thus, whether Rogers' bonus claim rest on a contract theory or a promissory estoppel argument, that claim fails.

### b.  Rogers is not entitled to a bonus under either the 2014 or 2016 agreement.

Rogers' 2016 employment agreement states the terms of his "bonus opportunity," stating "[t]he annual bonus is discretionary, and is based on [his] and Hillphoenix performance" and "is also ***tied to this new position and will be adjusted if no longer in the position***." *See, e.g.*, Ex. 1 to Burt Decl. (emphasis added). At one point, Rogers appeared to base his claim on an earlier agreement from 2014 that he admits signing. He fares no better under that agreement, which states that "To be eligible to earn a bonus, ***you must be an active employee on the payroll on the date the bonus is paid***." Ex. A-1 to Defendants' Answer and Counterclaims (Dkt. No. 104-1) (emphasis added).

"[E]ligibility for bonus payments is properly determined by the bonus plans' specific terms and general contract principles." *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509, 523 (2006). "California courts have consistently characterized bonus and profit sharing plans as constituting an offer of the stated benefits in exchange for the service of an employee, and upon the employee's completion of the required services in accordance with the terms of the plan, a binding contract is formed under which the employer is obligated to deliver the promised benefits." *Id.* (collecting cases).

A California Court of Appeal case is directly on point. In *Lucian*, the written employment plans at issue provided for a bonus that would be calculated and paid in full at the end of the calendar year, but specified that employees who voluntarily left the

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

company before the bonus calculation date would not be entitled to the bonus. *Lucian*, 116 Cal. App. 3d at 974–975. Three employees who departed voluntarily before the end of the year claimed entitlement to the bonus. *Id.* As the *Lucian* court noted, "a specific bonus plan normally becomes binding as a unilateral contract when the employee begins performance, in the sense that the plan then cannot be revoked by the employer." *Id.* at 976. Each plan at issue "had been consistently interpreted and applied to preclude the vesting of any benefits unless the participant completed the current calendar year in the service of his employer." *Id.* at 975. The *Lucian* court therefore concluded that summary judgment was properly granted in the employer's favor because "an employee who voluntarily leaves his employment before the bonus calculation date is not entitled to receive it." *Id.*

As in *Lucian*, the express terms of the 2014 employment agreement dictate that Rogers must have been employed when bonuses were paid out for him to receive his bonus. However, it is undisputed that Rogers left Hill Phoenix on January 18, 2019, which was before bonuses were paid under the AIP. Similarly, Rogers left his position before any alleged bonus was calculated, and under the terms of his 2016 agreement, that bonus was tied to the position Rogers left. Rogers therefore is not entitled to a bonus under either the 2014 or the 2016 employee agreements as a matter of law.

### 2. No waiting time penalties accrued.

Even if Rogers could establish that Hill Phoenix owed him an unpaid bonus, his counterclaim for waiting time penalties still fails because he cannot show that Hill Phoenix acted willfully. Under the California Labor Code, "[i]f an employer ***willfully*** fails to pay ... any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Cal. Labor Code § 203(a) (emphasis added).

Failure to pay is "willful" only if an employer "intentionally fails to pay wages to an employee when those wages are due." Cal. Code Regs. tit. 8, § 13520. An employer's nonpayment of wages is not willful if the legal duty to pay them is unclear. *Armenta v.*

21

*Osmose, Inc.*, 135 Cal. App. 4th 314, 325 (2005) (explaining that a "good faith belief in a legal defense will preclude a finding of willfulness"); *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.*, 102 Cal. App. 4th 765, 782 (2002). A good-faith dispute exists "when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist." Cal. Code Regs. tit. 8, § 13520(a).

As discussed above, Hill Phoenix disputes that it owes Rogers a bonus. As a result, even if Rogers were otherwise owed a bonus, his claim for waiting time penalties under Cal. Labor Code § 203 fails because Hill Phoenix did not act willfully.

### 3. Hill Phoenix did not fail to provide accurate wage statements.

The only alleged inaccuracy in Rogers' wage statement is the lack of a 2018 bonus. But as discussed above, Rogers was not entitled to a bonus. As a result, this claim fails as a matter of law, and summary judgment is therefore appropriate.

### 4. The retaliation claim fails as a matter of law because Rogers was not employed when the alleged retaliation took place.

"To establish a prima facie case of retaliation 'a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two.'" *Muniz v. United Parcel Serv., Inc.*, 731 F. Supp. 2d 961, 969 (N.D. Cal. 2010) (quoting *Mokler v. County of Orange*, 157 Cal.App.4th 121, 138 (2007). "[A]n adverse action 'must materially affect the terms, conditions, or privileges of employment.'" *Pinder v. Employment Dev. Dep't*, 227 F. Supp. 3d 1123, 1147 (E.D. Cal. 2017) (quoting *Yanowitz*, 36 Cal.4th at 1052).

Every act that is the basis for Rogers' retaliation claim -- other than the alleged failure to pay a bonus that Rogers was not owed – allegedly occurred after Rogers' employment ended. Answer and Counterclaims (Dkt. No. 104), at pp. 44-46, ¶¶ 94-100. Thus, as a matter of law, there could be no retaliation.

22

**B.**     **The intentional and negligent interference with economic advantage and claims fail as a matter of law.**

These claims each fail for several reasons. First, as a matter of law, the complained of activity—namely, the filing of this lawsuit—cannot support these claims. Second, with respect to the emotional distress claim, Rogers has failed to show either that he experienced outrageous conduct or that he suffered any emotional distress. Third, neither Rogers nor Classic can point to any damages for either claim.

**1.     The claims are barred by the litigation privilege and the *Noer-Pennington* doctrine.**

The interference claims are based solely on the existence of this lawsuit and alleged statements regarding it. See, Answer and Counterclaims, pp. 48-15, ¶¶ 115-121, 123-30. Litigation (and comments regarding litigation), however, predicate these claims because the litigation privilege and the *Noer-Pennington* doctrine preclude them as a matter of law.

Litigation privilege, established by California Civil Code § 47, protects conduct even if it is "alleged to be fraudulent, perjurious, unethical, or even illegal." *Kashian v. Harriman*, 98 Cal.App.4th 892, 920 (2002). Application of the privilege to allegedly unlawful conduct "is the 'price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say….'" *Silberg v. Anderson*, 50 Cal.3d 205, 212 (1990) (quoting Prosser, Law of Torts (3d ed. 1964, p. 797); *see also id.* at 213 ("The principal purpose of section [47(b)] is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions."). "To effectuate its vital purposes, the litigation privilege is held to be absolute in nature." *Id.* at 215.

In fact, "The policy of encouraging free access to the courts is so important that the litigation privilege extends beyond claims of defamation to claims of … ***interference with contract and prospective economic advantage***." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1132 (1990) (emphasis added); *see id.* at 1133); *see also Agostini v. Strycula*, 231 Cal.App.2d 804, 808 (1965) ("The statutory privileges that Civil Code

23

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

section 47 affords to certain oral and written communications are applicable to claims for intentional infliction of emotional distress."). "In fact, the privilege applies to any action except one for malicious prosecution." *Id.* at 1132.

It is undisputed that these claims are predicated on protected litigation activity, and Hill Phoenix is therefore entitled to judgment as a matter of law.

> **2.      Classic and Rogers have admitted that they have no evidence that they were damaged by the alleged economic interference.**

Classic and Rogers allege that Hill Phoenix is liable for intentional and negligent interference with economic advantage. Their theory is that seven identified customers have refused to do business with them because of this pending litigation. Yet at deposition they freely admitted that they cannot support any element of this claim, including the requirements that they establish specific business opportunities that they lost because of Hill Phoenix's actions, and show damages proximately caused by Hill Phoenix. *See*, *e.g.*, *Redfearn v. Trader Joe's Co.*, 20 Cal.App.5th 989, 1005 (2018).

First, at its Rule 30(b)(6) deposition, Classic conceded that six of these customers never told Classic that the litigation was the reason they did not send work to Classic, and that an alleged comment made by a Trader Joe's representative on the subject of the litigation was in the context of a broad discussion about the possibility of future work, not a specific opportunity. *See*, *e.g.*, Classic Tr. 113:25-114:12, 117:6-20, 131:12-132:24, 134:6-135:17, 300:12-22, 301:23-302:21,  304:4-17. That Classic is disappointed in not obtaining certain work is a far cry from showing that but for Hill Phoenix's conduct, it would have received it. Defendants admit that this theory is based on conjecture. Absent any evidence, their claims fail.

The same is true with respect to the amount of damages that would have resulted if Classic had been awarded work from these customers. During the Rule 30(b)(6) deposition, Classic made clear that it did not actually know how much it might have earned in revenue from various projects, and that any supposed lost profits numbers it offered  were based on assumptions and opinions – not on actual evidence. *See* Classic Tr. at, e.g., 103:16-19,

110:8-21, 125:9-11, 132:19-134:1, 138:14-141:2, 299:13-300:10, 301:1-303:7, 304:24-307:23. And when asked about how Defendants calculated the margins on a project Classic allegedly had lost, Classic's Rule 30(b)(6) witness David Lowe admitted that "I don't know how we arrived at that," and that he was not aware of any backup for those margins. Classic Tr. 309:20-310:4. This is all consistent with Rogers' individual testimony that determining lost revenue and profits is an exercise in speculation. Rogers Tr. II 137:1-139:15, 140:16-19, 141:4-16, 143:1-7, 143:20-22.

Again, it is undisputed that there is no evidence of lost business opportunity, and no evidence of damages, supporting the interference claims.

## V.    CONCLUSION

This is a straightforward case of disloyal employees improperly misappropriating trade secret and confidential information to start a competing business. Defendants have attempted to obfuscate the issues, asserting facially implausible defenses and numerous counterclaims as to which they freely admit they have no evidentiary support. This case cries out for summary resolution, and Hill Phoenix requests that the Court grant its motion as to each claim described above.

DATED: February 3, 2020                    Tucker Ellis LLP


                                           By:   /s/Brian K. Brookey
                                                 Brian K. Brookey

                                           Attorneys for Plaintiff,
                                           HILL PHOENIX, INC.