Mahyar Ghassemian, Esq. [SBN 203839]
mghassemian@glgattorneys.com
GHASSEMIAN LAW GROUP, APC
27405 Puerta Real, Suite 250
Mission Viejo, CA  92691
Telephone:  (949) 436-2785
Facsimile:   (949) 371-8076

Attorneys for Defendants,
CLASSIC REFRIGERATION SOCAL, INC. and DAVID ROGERS

Paul A. Hoffman, Esq. [SBN 146805]
pahoffman@hoffmanlegal.net
HOFFMAN LEGAL CORPORATION
27405 Puerta Real, Suite 250
Mission Viejo, CA  92691
Telephone:  (949) 600-8889
Facsimile:   (949) 297-3767

Attorneys for Defendant, THOMAS DAVID LOWE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| HILL PHOENIX, INC., a Delaware corporation,<br><br>          Plaintiff,<br><br>        vs.<br><br>CLASSIC REFRIGERATION SOCAL, INC., a California corporation; THOMAS DAVID LOWE, an individual; DAVID ROGERS, an individual; and TRAVIS VANDERLOON, an individual,<br><br>          Defendants. | Case No.:  8:19-cv-00695-DOC-JDEx<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  March 9, 2020<br>Time: 8:30 a.m.<br>Dept:  9D<br><br>Hon. David O. Carter |

# **TABLE OF CONTENTS**

<u>Description</u>:                                                                                    <u>Page No.</u>

I.    SUMMARY OF ARGUMENTS ..............................................    1

II.   STATEMENT OF FACTS ……………………………...…..    2

III.  LEGAL STANDARD FOR MOTION FOR SUMMARY
JUDGMENT …………………………………………………...    4

IV.   ARGUMENT …………………………………..……………    5

    A. HP is Not Entitled to Summary Judgment on Its Trade
    Secret Claims.…………………………………………………..    5

       1.  Genuine Issues Exist as to the Existence of  Trade
          Secrets………………………………………………………    5

          a.  HP Fails To Demonstrate the Existence of Trade Secret
             Information or its Independent Economic Value………    5

             i.    Customer Lists are not Trade Secrets in the
                   Contracting Industry……………………………..    6

             ii.  A Wage Matrix is not Trade Secret in the
                 Contracting Industry…………………………………    7

             iii. Installation Proposal/Contract/Sales Order/Job
                 Costing Templates are not Trade Secrets in the
                 Contracting industry…………………………………    7

       2.  Genuine Issues Exist as to HP's Taking Reasonable
         Measures to keep information secret…………………………    7

       3.  Genuine Issues Exist about Misappropriation of Trade
         Trade Secrets ……………………………………………    8

          a.  The Special Master Believed the Defendants'
            Testimony about Use of Trade Secrets…………………    8

          b.  Defendants Did Not Use Any Trade Secrets to Solicit
            Business of Recruit Former HP Employees to Work
            With Classic…………………………………………    9

       4.  HP Fails to Provide Any Evidence That It Incurred Damages
         From Alleged Misappropriation of Trade Secrets……………    10

    B.    HP is Not Entitled to Summary Judgment on Breach of
        Contract………………………………………………………..    10

## <u>TABLE OF CONTENTS (CONTINUED)</u>

<u>Description</u>:                                                          <u>Page No.</u>

1. a Genuine Issue of Material Fact Exists as to formation
   of a valid Contract……………………………………          10

   a. John Patterson, HP's star witness testified he has no
      personal knowledge about the contracts in
      question and therefore his Declaration and supplemental
      Declaration should be stricken …………………………          10

   b. Michael Eakins, the VP of HP who Extended the Offer
      of employment to Rogers and promoted Lowe, states
      under Oath that he has no recollection of the Alleged
      Contracts …………………………………………….          11

   c. Jim Maxwell, the Human Resources Manager at AMS
      When asked by corporate office of HP for a copy of Rogers'
      employment contract, could not locate it…………………          12

2. There is a Genuine Issue as to whether HP performed
   under Rogers' Contract …………………………………...          13

3. There is a Genuine Issue as to whether the Defendants
   Breached any Agreements because they did not take any Trade
   Secrets or Use any Trade Secret or Confidential Information …   13

C.   Genuine Issues Exist as to the Labor Law Counterclaims……..   13

   1. Unpaid Wages……………………………………………..          13

      a. The Bonus was not discretionary and must have been
         Paid when Rogers left HP……………………………          16

      b.  Rogers earned a bonus for 2018……………………          17

      c.  The bonus was due to Rogers despite the fact he
          Left HP………………………………………………          18

         i.   The 2016 offer letter does not specify that Rogers
              Had to be employed on a specific date to receive
              The bonus……………………………………..          18

# TABLE OF CONTENTS (CONTINUED)

Description:                                                          Page No.

    ii.  The 2014 employment agreement does not
        apply to the 2018 bonus……………………… 19

    iii. The bonus was fully calculable on the date
        Rogers left HP………………………………….. 19

    iv. Others had left the company and still received
        Their bonuses………………………………… 20

    v.  Sindoni admitted the bonus was due…………… 20

  2.  Waiting Time Penalties Are Due Since The Bonus was
    Never paid…………………………………………….. 20

  3.   Failure to Provide Accurate Wage Statements…………… 21

D. Defendants Can Prevail On Their Retaliation Counterclaim…….. 21

E. Genuine Issues exist regarding Counterclaims for Breach of
   Contract and Promissory Estoppel…………………………….. 23

F.   Genuine Issues of Material Fact exist regarding the Interference
   Counterclaims…………………………………………………….. 23

Conclusion………………………………………………….. 25

# TABLE OF AUTHORITIES

<u>Description:</u>                                                                                      <u>Page No.</u>

*Abba Rubber Co. v. Seaquist*, 235 Cal.App.3d 19 (1991) ………………    5

*Aetna Bldg. Maint. Co. v. West* 39 Cal.2d 198 (1952) …………………..    9

*American Paper & Packaging Products, Inc. v. Kirgan* 183 Cal.3d

     1318 (1986) ………………………………………………………    6

*Blount v. Morgan Stanley Smith Barney LLC*, 982 F. Supp. 2d 1077

     (N.D. Cal. 2013) …………………………………………………..    21

*Celotex v. Catrett*, 477 U.S. 317 (1986) ……………………………………    4

*Continental Car-Na-Var Corp. v. Moseley* 24 Cal.2d 104 (1944) …………    9

*Curley v. City of N. Las Vegas*, 772 F.3d 629 (9th Cir. 2014) ……………..    4

*Hector v. Wiens*, 533 F.2d 429 (9th Cir. 1976) ……………………………    5

*Hill v. Kaiser Aetna*, 130 Cal.App.3d 188 (1982) …………………………    18

*Milovich v. City of Los Angeles*, 42 Cal.App.2d 364 (1941) ………………    18

*Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005) ………    4

*Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514 (1997) …………………………    6

*Neisendorf v. Levi Strauss & Co.*, 143 Cal.App.4th 509 (2006) ……………..    18

*Robinson v. Shell Oil Co.*, 519 US 337 (1997) ………………………………    21

*Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) …………...21

# **STATUTES**

| Description: | Page No. |
| --- | --- |
| 8 C.C.R. §13520 ……………………………………………………… | 20 |
| 18 U.S.C. §1839(3)(A)-(B) …………………………………………... | 5 |
| 29 C.F.R. §778.211(b) …………………………………………….. | 16 |
| 29 C.F.R. §778.211(d) …………………………………………….. | 16 |
| Fed. R. Civ. P. 56(a) ……………………………………………….. | 4 |
| FRCP Rule 56(c)(4) ……………………………………………….. | 10 |
| Labor Code §200 …………………………………………………... | 16 |
| Labor Code §202(a) ……………………………………………….. | 16 |

## I.  SUMMARY OF ARGUMENTS

Hill Phoenix ("HP") fails to carry its burden as it fails to show that AMS had trade secrets or confidential information, that defendants used these and that HP suffered damages.  In the Refrigeration Contracting industry, a wage matrix is not trade secret, and neither are installation proposal, contracts, sales orders, job costing templates.   A refrigeration expert with 45 years of experience in the industry along with multiple other refrigeration professionals confirm this in their declarations. HP argues that AMS had trade secrets, but fails to show evidence of reasonable measures to keep the information secret.

Genuine issues exist about misappropriation of trade secrets.  The Special Master interviewed defendants and believed their testimony that they did not take _any_ trade secrets or _use_ any information or documents taken to solicit business or recruit former HP employees.  In addition, HP fails to provide any evidence that it incurred damages from alleged misappropriation of trade secrets

HP is not entitled to summary judgment on breach of contract because there is a genuine issue about the formation of a valid contract. HP's star witness testified under oath that he has no personal knowledge about the contracts in question because he was not involved in hiring or the process of these contracts.

Both Rogers and Lowe dispute signing of the employment agreements. Further, former HP VP does not recall the agreements he is supposed to have sent to Rogers and Lowe, and HP's former HR manager recalls that HP corporate did not have the file in early 2019 and called him to look for it.  To top it all off, a DocuSign expert found the signatures to be "invalid".

There are also genuine issues as to HP's performance (not paying Rogers' bonus) and the Defendant's breach when they did not take or use any trade secret or confidential information.  HP is asking for summary judgment on a breach of

contract claim, where there are genuine issues of material fact about the contract's <u>formation</u>, HP's own <u>performance</u> of the contract and the <u>Defendants' breach</u>!

As to HP's claims that Rogers was not entitled to a bonus, the 2016 offer letter, which HP relies on and should be held to, does not specify that Rogers had to be employed on a specific date to receive the bonus, and  the 2014 employment agreement does not apply to the 2018 bonus.  Further, HP's President testified that the bonus was fully calculable on the date rogers left HP and he was willing to give Rogers the "value of his bonus", while others who left had received their bonuses.

There are genuine issues of material fact as to claims for Waiting Time Penalties because the bonus was which were due since the bonus was never paid and HP failed to provide accurate wage statements showing the bonus..

On the other hand, Defendants can prevail on their retaliation counterclaim and genuine issues exist regarding counterclaims for Breach of Contract and Promissory Estoppel as well as the interference counterclaims.

HP is not entitled to summary judgment. The Court should deny the motion.

## II.    STATEMENT OF FACTS

Hill Phoenix, Inc. ("HP") is an established corporation in the industrial and commercial refrigeration space.  Compl. Dkt. 101, ¶7.  AMS is short for After Market Services, a division of HP which is its contracting arm and where defendants were employed.  AMS's work focuses on contracting to install, service, repair and do warranty work for large size refrigeration systems.  AMS operates under a contractor's license f and in California, it comes within the authority of the California State Contractors License Board ("CSLB").  In this sense, AMS is different from other divisions of HP because its only job is contracting and therefore it operates like a construction company. Declaration of David R. Tuttle ("Tuttle Dec")¶7. The majority of HP is focused on manufacturing.  Tuttle Dec ¶ 8.

David Rogers ("Rogers") is the former General Manager ("GM") of the AMS Group.  Rogers joined HP in 2014 and was promoted to GM of AMS Group in July 2016.  Rogers Dec III, ¶3[1]; Eakins Decl., ¶11.  He left HP in January 2019.

Thomas David Lowe ("Lowe") is the former Branch Manager for the AMS Group and a veteran in the refrigeration industry.  After Rogers left HP, he formed a company and later Lowe and others from HP joined him. HP filed this retaliatory lawsuit alleging misappropriation of Trade Secrets, Breach of Contract and other claims against the partners and the newly formed company.

**Procedural history of the suit:** After the complaint was filed, the Court entered a TRO and appointed a Special Master to determine whether the Defendants had complied with the TRO and returned any documents they had and deleted such documents from their personal computers.

The Special Master ("SM") interviewed 5 former HP employees including Rogers and Lowe and his Report and Recommendations dated September 6, 2019 strongly supports Defendants' position that no HP trade secrets were misappropriated.  The SM determined all 5 witnesses to be credible and further indicated that "After the TRO issued, the Special Master finds that Defendants did not utilize HP's confidential or trade secret information to perform work on behalf of Classic." (SM Report, p.5). "[E]ven though certain alleged confidential and/or trade secret documents were taken from HP and downloaded and accessed through the Witnesses' personal computers, the Witnesses testified, under oath, that they did not transmit or utilize information from those documents". (SM Report, p.6).

**Counterclaims of Rogers and Classic**: Rogers did not get paid his bonus when he left HP.  Rogers Dec III ¶7.  Ex "2". On February 7, 2019, he received an e-mail from HP President Paul Sindoni ("Sindoni") titled:  "2018 Bonus" stating:

---

[1] Rogers Dec I: Declaration Docket 22; Rogers Dec II: Declaration Docket 57-1; Rogers Dec III: Declaration filed in support of this Opposition

> " I hope all is well and you are finding a good path to your next step in your career.   You left a good team in place and they are doing well-should be a good year for them again…Bonuses get approved with the board over the next couple of weeks.  Once they are, I will send over a document to sign for us to release the funds.  Should be nothing surprising, just affirmation of the key points you agreed to in your employment agreement…Look for that in about 2 week." Rogers Dec III ¶8.

On March 15, 2019 he received another e-mail from Sindoni, with the subject line: "Release" which attached a "Separation Agreement" and in it Rogers was promised $102,283.00 in exchange for his signing and not revoking the Agreement and releasing "any claims or causes of action that you may have or have had under any law, statute, rule, regulation or enactment dealing with employment…as well as any claims for breach of contract, wage or compensation claims subject to a bona fide dispute, and all other common law contract and tort claims."  Rogers Dec III ¶9.  Rogers did not sign it. Rogers Dec III ¶10. Later Rogers counterclaimed for various labor law claims as well as Breach of Contract, Promissory Estoppel, and Retaliation against HP.

## III.    LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT

A party may move for summary judgment and the court shall grant it when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005).

A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. In determining whether to grant summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Curley v. City of N. Las Vegas*, 772 F.3d

– 4 –

629, 631 (9th Cir. 2014). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

## IV.   ARGUMENT

### A.   HP Is Not Entitled to Summary Judgment on Its Trade Secret Claims

A prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff. (Civ.Code, § 3426.1)

#### 1.   Genuine Issues Exist as to the Existence of Trade Secrets

##### a.   HP Fails To Demonstrate the Existence of Trade Secret Information or its Independent Economic Value

In order to be subject to trade secret protection, the information sought to be protected must "derive independent economic value from being not generally known nor readily ascertainable through proper means by another" and subject to "reasonable protective measures" taken by the owner of the information. 18 U.S.C. § 1839(3)(A)-(B); Civ. Code § 3426.1(d). The independent economic value must arise because the information is *not generally known to the public or competitors*. *Abba Rubber Co. v. Seaquist*, 235 Cal.App.3d 19, 20 (1991).

HP alleges without any supporting evidence or detailed specificity, the vague and ambiguous existence of "numerous trade secrets" which it claims Defendants allegedly took. HP's Motion for Partial Summary Judgment ("MSJ") concerns only the following six alleged trade secrets: a customer list, customer master location list, a wage matrix, a contract sales/change order, costing templates, and an "Installation Proposal/Contract". Unlike HP's business of manufacturing and "sale of commercial refrigeration systems" where patents and

other proprietary information is frequently utilized,  HP's AMS Group operates as a contracting business within the refrigeration industry providing aftermarket services, including installing, maintaining, and repairing refrigeration equipment at customer sites." (Declaration of John Patterson ("Patterson Dec") ¶2; Declaration of David Tuttle ("Tuttle Dec") ¶7; Rogers Dec II 57-1 ¶20. Refrigeration Contracting expert David Tuttle who has spent over 45 years of his life in this industry testifies that there simply are no trade secrets regarding any of the six alleged "secrets" in the refrigeration contracting industry. Tuttle Dec ¶¶14-20.

> i.   Customer Lists are not Trade Secrets in the Contracting Industry

HP fails to provide undisputed facts to support its claim that a purported customer list and Customer Master Location List are trade secrets or confidential.

[C]ourts are reluctant to protect customer lists to the extent they embody information which is "readily ascertainable" through public sources, such as business directories. *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514 (1997) The customer list of a paper and packaging products manufacturer was found not to be a trade secret, when names were "generally known in the trade and *already used* by good faith competitors." *American Paper & Packaging Products, Inc. v. Kirgan* 183 Cal.3d 1318, 1326 (1986). Here, the identity of potential customers of retail refrigeration contracting companies such as AMS and Classic are generally known within the industry, and easily ascertainable. Eakins Dec, ¶23; Lowe Dec II, ¶¶9, 15; Lamping Dec, ¶6, Tuttle Dec ¶21.

As of May 2019, AMS had only a handful of large retail and chain store customers. Lowe Dec, ¶¶9, 15. Those customers constitute about 90% of the AMS's business. Eakins Dec ¶23. Contact information for such customers is easily obtained by using LinkedIn or by calling the publicly-available business phone numbers of the customers and asking for the relevant contact person. Lowe Dec, ¶¶9, 15; You can then get his/her cell phone number and/or email address. *Id.*

As a small close-knit industry, it is well known to Defendants and others who are experienced in refrigeration contracting what the preferences of any given customers are. Rogers Dec 57-1 ¶¶24; Eakins Dec, ¶25; Lowe Dec 57-6 ¶15; Lamping Dec 57-5 ¶6. A competitor's costs, margins, and/or pricing do not always impact a customer's selection. It is the professional's personal experience and reputation that makes a bid competitive. (Rogers Dec II ¶22.)

> ii.   A Wage Matrix is not Trade Secret in the Contracting Industry

Plaintiff's characterization of a wage matrix document as a trade secret is similarly misplaced. AMS, as a contracting business within the refrigeration industry prepares bids utilizing union workers, and therefore relies on a union wage schedule (a public document) to calculate their bids. Lowe Dec ¶14. Tuttle Dec ¶19.  Moreover, knowledge of wage and material costs is known to all with significant experience in the industry, such as HP and Defendants. *Id.*, ¶16. Declaration of Danny Lamping, ¶6.

> iii.   Installation Proposal/Contract/Sales Order/Job Costing Templates are not Trade Secrets in the Contracting industry.

Plaintiff's argument about the installation proposal ("bid") being a trade secret similarly fails as bids are simple forms or Excel sheets that can be downloaded from the internet and filled out based on known parameters and a contractor's experience and knowledge. Rogers Dec II ¶21; Tuttle Dec ¶17. Installation proposals and contracts are not proprietary or unique and it is commonplace for competitors to see each other's bids <u>after</u> a contract is awarded.. (Rogers Dec II ¶23; Tuttle Dec ¶¶14, 17.

## 2.   Genuine Issues Exist as to HP's Taking Reasonable Measures to keep information secret

HP fails to show that there were any specific company-wide customer contact lists for AMS (aside from their employees' cell phone contacts) or that HP

took any specific measures to keep such information secret. In fact, David Tuttle, who had been with HP and its predecessor for 45 years, states that in all his years he never saw a confidential customer list at HP. Tuttle Dec ¶9.

HP's former field service manager Kinman confirms under oath that no official customer list was ever provided by HP. Instead as a manager, the only customer list he had was one he created himself on an Excel spreadsheet to which he added customers names as time went on, with no HP directive to keep such information confidential. Declaration of Scott Kinman ("Kinman Dec,") ¶¶11, 12.

At no time had HP sent any directives to the employees to keep their contact numbers secret, that they belonged to HP, or that the use of their cell phones was to be limited to work contacts. Kinman Dec¶12. As a result, Rogers and Lowe saved both personal and professional contacts on their cell phones. Nor had HP given its employees a list of company contacts with directions to keep the numbers secret. Kinman Dec ¶¶11, 12; Lowe Dec 57-6 ¶7. Genuine issues of material fact exist.

### 3.    Genuine Issues Exist about Misappropriation of Trade Secrets
#### a. The Special Master Believed the Defendants' Testimony about Use of Trade Secrets

HP alleges that Defendants misappropriated a customer list and used it to solicit existing HP customers. Renee Israelson, who was interviewed and believed by Special Master, states otherwise. Israelson, who in April 2019 was sick and suffering from chronic fibromyalgia inadvertently emailed an HP Customer file to her own email address instead of Randy Wagner, a project manager at HP who had asked for it. Declaration of Renee Israelson ("Israelson Dec"), ¶¶13,14. Israelson never shared the HP customer list with anyone outside of HP, and never used it. ("Israelson Dec"), ¶¶20,21.)  SM report pages 7 and 8.

HP has also fails to establish any evidence that Lowe "accessed" confidential files of HP's while having a thumb drive inserted into his computer,

nor that he downloaded or otherwise transferred any of these files to himself or Classic. (Lowe Dec, ¶¶12-13; Vaughn Dec, ¶9, and Ex. 2, 3.)

HP's expert, James Vaughn's Declaration provides that <u>his digital forensic analysis did not have the ability to determine if a complete set of files were copied to the USB drives</u>: "Still, it is reasonable to ***infer*** that, when several files are opened within a short time concurrently with the connection of a USB drive, those files ***may*** have been copied to the USB drive." Vaughn Dec Dkt. 121-1¶14. Therefore, **Vaughn's opinion itself creates a genuine issue of fact** as to whether the files were actually copied. His opinion provides **no evidence** that Defendants wrongfully acquired, disclosed, or used HP's trade secrets.

HP similarly fails to show **any** evidence that Classic received the alleged misappropriated trade secrets through its employees.

b.     <u>Defendants Did Not Use Any Trade Secrets To Solicit Business or Recruit Former HP Employees To Work With Classic</u>

Passive acceptance of business from the former employer's customers does not constitute solicitation. *Aetna Bldg. Maint. Co. v. West*, 39 Cal.2d 198 204, 246 (1952).  "A former employee has the right to engage in a competitive business for himself [or with others] and to enter into competition with his former employer, even for those who had formerly been the customers of his former employer, *provided* such competition is fairly and legally conducted." *Continental Car-Na-Var Corp. v. Moseley* 24 Cal.2d 104, 110, 148 (1944) (emphasis added).

Here, Defendants never misappropriated the customer list nor used any such lists in any manner to solicit customers. Indeed, with over 40 years each of experience in the refrigeration industry Defendants Rogers and Lowe were well known within the close-knit industry. Rogers Dec DKT. 57-1 ¶¶24, 26; Lowe Dec DKT 57-6 ¶17; Eakins Dec, ¶25, Tuttle Dec ¶22.

No solicitation of any kind was necessary for Classic due to the nature of the industry, as word of movement and changes spread quickly then customers started

reaching out to Classic via its website and through union connections. Rogers Dec
II ¶24, 26-27; Lowe Dec II ¶11. Classic never solicited any HP customers.
Lamping Dec, ¶6

Likewise, though several former employees of HP accepted employment
with Classic, Classic has not solicited any HP employees to come work with it.
Rogers Dec II ¶27; Lamping Dec, ¶3; Declaration of Chad Van Nerynen, ("Van
Nerynen Dec"), ¶3. Rather, the employees who left HP did so due to dissatisfaction
with HP, and many joined Classic because of longstanding relationships with
Classic's principals. Lamping Dec ¶¶3-4; Van Nerynen Dec ¶3. Staffing at Classic
involved no use of trade secrets of HP whatsoever. *Id.*

**4.     HP Fails To Provide Any Evidence That It Incurred Damages From Alleged Misappropriation Of Trade Secrets**

HP's moving paper contains almost two pages under the subtitle damages,
but fails to meet its burden because it is entirely devoid of any evidence, that HP
incurred any damages from Defendants' alleged misappropriation of trade secrets.

There is no evidence of threatened loss of prospective customers, no
evidence of damage to on-going recruitment efforts or any harm to its goodwill and
business advantage. Summary Judgment is not appropriate.

**B. HP is Not Entitled to Summary Judgment on Breach of Contract**

**1.  A Genuine Issue of Material Fact Exists as to formation of a valid Contract.**

a.   John Patterson, HP's star witness testified he has no personal
knowledge about the contracts in question and therefore his
Declaration and supplemental Declaration should be stricken

"An affidavit or Declaration used to support or oppose a motion must be
made on personal knowledge, set out facts that would be admissible in evidence,
and show that the affiant or Declarant is competent to testify on the matters stated."
FRCP Rule 56(c)(4).

The only claimed evidence supporting plaintiff's allegations of binding contracts with Defendants, comes from Patterson's Declarations. Plaintiff's Separate Statement # 58,59. However, John Patterson did not even begin working at HP until after Dave Rogers had left HP in 2019. Patterson Tr. 14:12-19; Declaration of Mahyar Ghassemian ("MG Dec") ¶3. He testified he was with a manufacturing division of HP prior to joining AMS, was not involved in the hiring or promotion of Rogers, or Lowe, and that he has no personal knowledge about the documents in question.  Patterson Tr. 22:2-14; MG Dec ¶3.

HP has failed to produce undisputed evidence of the validity of the contracts.

b. <u>Michael Eakins, the VP of HP who Extended the Offer of employment to Rogers and promoted Lowe, states under Oath that he has no recollection of the Alleged Contracts</u>

Michael Eakins ("Eakins"), states under penalty of perjury that he does not recall seeing the employment offer letter or alleged signed acceptance, from HP to Rogers dated July 22, 2016.  Declaration of Michael Eakins ("Eakins Dec") ¶14. Rogers and Lowe testified they do not remember signing these contracts.  Rogers Dec II ¶¶9-11; Lowe Dec II ¶¶4 and 5.

Eakins would "…normally get copies of such letters for [his] files and [he does] not recall having a copy of the [letters for Rogers or Lowe] in [his] files…" (Eakins Dec ¶17, 18). Eakins also states that having known Rogers well, he believes that if Rogers had signed this letter, as a meticulous business individual, he would have kept a copy of it for his file.  Eakins Dec ¶15.

This confirms Rogers and Lowe's testimony both of whom state under penalty of perjury that they each have a habit of keeping copies of important documents and that neither one has copies of these documents in their files. Rogers Dec II ¶11; Declaration of David Lowe DKT 57-6 ("Lowe Dec II")[2] ¶5.

---

[2] Lowe Dec I: Declaration Docket 33; Lowe Dec II: Declaration Docket 57-6; Lowe Dec III: Declaration filed in support of this Opposition

Both Lowe and Rogers state they have a habit of reading all documents they sign would not have agreed to such restrictive provisions in the Employment Agreement.  Rogers Dec 57-1 ¶10; Lowe Dec II ¶4. Genuine issues exist as to validity of the signed employment contract between HP and Defendants.

c.  <u>Jim Maxwell, the Human Resources Manager at AMS when asked by corporate office of HP for a copy of Rogers' employment contract, could not locate it.</u>

Jim Maxwell ("Maxwell") was the Human Resources ("HR") Manager at the AMS division of HP from August 2016 until April 2019, during the time Defendants were employed at HP.  (Maxwell Dec ¶3).  His HR job included Rogers as an HP employee. *Id.* In late 2016 when Maxwell performed an audit of the HR files for employees, David Rogers' file did not contain an employment agreement. (Dec Maxwell ¶7). He contacted HP's corporate office about this issue but did not get a response as to why this was the case. *Id.*

More interestingly, in early 2019 after Rogers had left HP, Mark Kennedy of HP Corporate office called Maxwell and asked for Rogers' file, specifically asking for his employment contract, the one at issue here.  Maxwell could not locate any such employment contract. Dec Maxwell ¶8-9. Per HP, Mark Kennedy is the one who had allegedly received the DocuSigned contract from Rogers HP's paper!!

d.  <u>DocuSign Expert found the signatures to be "invalid"</u>

HP has only produced an electronic signature for Rogers and Lowe.  When trying to open the digital DocuSign file on a computer, for both documents, a warning message comes up in the signature panel which states: "At least one signature has problems."  Defendants hired an expert in DocuSign to analyze this issue and in her declaration she states that the document analysis for both these documents has been inconclusive, but that evaluation of the documents through the DocuSign validation tool shows their status as "invalid". Declaration of Doris Little ("Little Dec") ¶¶7 and 8, Exhibit ("Ex") A.

### 2. There is a Genuine Issue as to whether HP performed under Rogers' Contract

As discussed at length below, HP failed to pay Rogers his earned bonus in the face of his great job performance, multiple attestations of the HP's President in regard to Rogers' excellent performance, and the admittance by HP's president that he was owed a bonus which would be forthcoming. Rogers Dec ¶7, Ex. 3.

### 3. There is a Genuine Issue as to whether the Defendants Breached any Agreements because they did not take any Trade Secrets or Use any Trade Secret or Confidential Information

<u>Defendants did Not Take **any** Trade Secrets</u>: As discussed above, Defendants did not take <u>any</u> Trade Secrets or Confidential information, nor use any such information. Lowe Dec II ¶6. SM found that they returned all information taken, and deleted from their devices. Rogers Dec I ¶¶9, 10; Lowe Dec II, ¶¶6,7,12. SM 5:19-21;6:16-17.

Expert David R. Tuttle, who has 45 years of experience in the refrigeration industry, states in his Declaration under penalty of perjury that the documents alleged to be Trade Secret or Confidential by HP, in fact are not.  Tuttle Dec ¶¶14 to 20. Because of the contracting nature of AMS - which is not a manufacturing business – bids, contracts, scopes of work, change orders and job costing, margin and wage matrix information are not confidential or Trade Secret and they are all within the public domain. I*d*.  He and Kinman both testify that in all their years with HP, they had not seen any confidential customer lists. Tuttle Dec ¶9; Kinman Dec ¶¶11, 12.   Don Smith, former AMS Director of Operations for West Coast, confirms this and so does Michael Eakins.  Smith Dec ¶¶8-11. Eakins Dec ¶23.

## C. <u>GENUINE ISSUES EXIST AS TO THE LABOR LAW COUNTERCLAIMS</u>

### 1. **Unpaid Wages:**  On July 11, 2016, Mike Eakins of HP sent an offer letter to Rogers offering him the position of General Manager. Although Rogers disputes signing this letter, HP has been relying on it. HP's Separate Statement No. 76; disputed by Defendants.  In so far as HP had a belief that it had sent this letter

and was operating on that belief at the time it dealt with Rogers' bonus issue, it must be held to its terms as an offer.

This letter provides for a 30% bonus based upon the performance of Rogers and the company. The letter does not contain any other metrics required for the bonus. MG Dec. ¶11, Exhibit 6.  The letter also **does not indicate that Rogers still had to be employed on a certain date to receive the bonus**. *Id.* In December of 2017 or January of 2018, HP's Vice President of HR, Shawn Simmons, sent out an email to all employees indicating that anyone who was employed on the last day of 2017 would receive their bonus for 2017 in 2018. Declaration of James Maxwell ("Maxwell Dec") ¶4. This policy had not changed until 2019. Maxwell Dec ¶6. Furthermore, other employees have left the company and have still received bonuses after they have left. Rogers Dec III ¶22.

In the new GM position, Rogers' performance was measured by an AIP plan. Rogers Dec III ¶ 17. He received a 30% bonus for both 2016 and 2017 under this plan and received regular salary increases. Rogers Dec III ¶ 17.

In 2018, Paul Sindoni met with Rogers and issued a set of objectives for Rogers to meet in the coming year, and Rogers indeed did meet those objectives. Sindoni Tr. 21:25, 22:1-5 MG Dec¶5. Rogers had a good year in 2018, and performed well as General Manager. AMS performed better than 100% in 2018 and. Sindoni admits that Rogers contributed to that achievement. *Id.*  In fact, all those in managerial positions at AMS including Lowe, Lamping and Scott Kinman received higher bonuses for the year 2018 than the year before based on the overall performance of AMS under Rogers' direction.  Lowe Dec ¶ 14, Kinman, Dec ¶14)

When Rogers joined HP in 2014, he held a different position with different bonus structure and percentage not under AIP, but as his bonus was per AIP plan which continued until he left HP. Rogers Dec III ¶16.*Id.*

For the previous year 2017, Rogers had sent Sindoni an AIP plan and was paid a bonus which closely matched the one in AIP plan. Rogers Dec III ¶17. For 2018, the bonus was computed the same way as in 2017. *Id.*

Sindoni provided the template for the 2018 AIP plan to Rogers. Rogers Supp. Dec ¶18. Rogers emailed a completed AIP plan to Sindoni in December, 2018 and then again a final one on January 3, 2019 when the numbers for the year end were complete. *Id*. Sindoni testified in his deposition that he never questioned the self-assessments done on the AIP statements by those who reported to him and relied on those. Sindoni deposition transcript ("Sindoni Tr.") 35:24-25, 36:1-2. MG Dec ¶5. He reviewed the performance numbers with the General Managers on a monthly, quarterly and yearly basis. Sindoni Tr. 123:9-16, and stated "Dave would have known exactly what the actual performance was up through November." Sindoni Tr. 123:23-25; MG Dec ¶5. The bonus was based on numbers received from those in the finance department. Sindoni Tr. 124-8-25; MG Dec ¶5.  Rogers got the exact numbers from the finance department, so his bonus was calculable at least as of January 3, 2019. Rogers Dec ¶19; Sindoni. Tr. 123:23-25, MG Dec.¶5.

On January 8, 2019, Paul Sindoni sent out an email to all employees in which Rogers' exemplary work performance was mentioned. Rogers Dec III ¶5. Rogers' last day of work at HP was January 18, 2019, but his final paycheck did not include his 2018 bonus. Rogers Dec III ¶¶4, 6, and 7.On February 7, 2019, Paul Sindoni sent Rogers an email acknowledging that a bonus was still due and owing to Rogers. Rogers Dec III¶8; Exhibit 3.

However, on March 15, 2019, Sindoni sent Rogers a release document requesting additional affirmations from Rogers in exchange for the sum of $102,283.00, which he admitted that this amount was the "value of the bonus" which Rogers should have received. Rogers Dec III ¶9 Sindoni Ind Tr 60:17-19.

Labor Code §200 provides that "wages" include all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by time, piece, commission basis, or other method of calculation. The California Department of Labor Standards Enforcement provides that sums earned as bonuses are "wages" under the definition provided by Labor Code §200. Labor Code §202(a) provides that all wages must be paid to an employee who quits his employment with at least 72 hours' notice on the date the employment terminates.

HP benefitted greatly from Rogers' effort and time and has admitted that he performed well in his position and exceeded all goals he was given in 2018. Rogers Dec III ¶5, Exhibit 1. Sindoni Tr. 21:25, 22:1-5, 16-22. MG Dec ¶5. Unfortunately, in a prime example of "sour grapes," after Rogers left the company, HP refused to pay him the bonus which he had worked for and certainly deserved.

### a. __The Bonus was not discretionary and must have been paid when Rogers left HP__

Although HP attempts to characterize the bonus which is owed to Rogers as "discretionary," it was not. Pursuant to 29 C.F.R. §778.211(b) in order for a bonus to be considered discretionary for wage and hour calculations, the employer must retain discretion as to both the fact of the payment and the amount, and the employee must have no contract right, express or implied, to any amount. Per this section, if the employer promises in advance to pay a bonus, it has abandoned any discretion with regard to the bonus. Although HP insists that the bonus is "discretionary," that label is not determinative. Instead, the facts specific to the bonus at issue determine whether a bonus is discretionary. 29 C.F.R. §778.211(d).

Here, the bonus was based on specific metrics and calculations in the AIP statement.  In fact, in his deposition, Paul Sindoni was questioned at length about all the parameters that made up the AIP bonus calculations.  Sindoni Tr. Pages 109-129 MG Dec ¶ 5. There was no discretion as to the fact of the payment

because the letter states, "<u>if you do well you will get the bonus</u>" and Rogers performed well.  In fact, he did so well that Sindoni congratulated him and his division several times in the January 8, 2019 email to all HP:  "our AMS team has delivered another excellent year with better than plan sales and earnings.  Thank you to all on our AMS team" Rogers Dec III ¶5, MG Dec ¶ 5. "Dave Rogers will be leaving DFR to focus on new opportunities in his future.  We thank Dave for an excellent run, through his direct accomplishments, with the AMS team." *Id*.

Further the bonus was announced in advance to Rogers by HP via the July 11, 2016 offer letter. This offer letter was HP insists controls the employment, is an express promise to pay the bonus if Rogers performed. HP had also paid the bonus to Rogers for the two previous years under the AIP plan, and there had been no changes announced with respect to how the bonus would be calculated for 2018. There was no discretion involved, the bonus was based upon the numbers which were in the AIP plan.  HP simply decided not to pay an earned bonus to an employee upon his departure.

### b. <u>Rogers earned a bonus for 2018</u>

There is no question that Rogers earned and deserves his 2018 bonus. He exceeded all goals which were given to him for the year. Sindoni himself has testified that Rogers met his objectives, that company performed well in 2018, and that Rogers was a part of that achievement. *Id*. Sindoni's email on January 8, 2019 discussed above showed this.  He further admitted that Rogers was due a bonus in his February 7, 2019 email titled "Bonus" to Rogers that stated:

> "I hope all is well and you are finding a good path to your next step in your career.   You left a good team in place and they are doing well – should be a good year for them again.
>
> Bonuses get approved with the board over the next couple of weeks. Once they are, I will send over a document to sign for us to release the funds.  Should be nothing surprising, just affirmation of the key points you agreed to in your employment agreement.
>
> Look for that in about 2 week…." Rogers Dec III ¶8.

So, the bonus was due and Sindoni further admitted that the figure he put in the release document was the "value of the bonus" which Rogers should have earned for 2018. Sindoni Tr. 59:17-22, 60:17-19, 62:9-11.

### c. **The bonus was due to Rogers despite the fact he left HP**

i. The 2016 offer letter does not specify that Rogers had to be employed on a specific date to receive the bonus

In *Neisendorf v. Levi Strauss & Co.*, 143 Cal.App.4th 509, 520-521 (2006), the court looked to the employment agreement to determine whether an employee who was terminated was entitled to her bonus, noting that "eligibility for bonus payments is properly determined by the bonus plans' specific terms and general contract principles." In <u>Neisendorf,</u> the court found that the employee was not entitled to the bonus as the bonus plan indicated that she had to remain an "active employee" on the bonus payment date. But an employee must remain employed to receive a bonus <u>when the bonus plan specifies this requirement.</u>

In fact, in *Hill v. Kaiser Aetna*, 130 Cal.App.3d 188 (1982), the court held that an employee who had voluntarily resigned was found to have a vested right in the bonus, since the bonus plan did not expressly require continued employment and the bonus was an inducement for continued employment.

Here, the AIP did not require Rogers to remain employed on a specific date in order to receive the bonus, neither did the July 11, 2016 offer letter. Further, the offer letter indicates that if Rogers were no longer in the position, that the bonus would be "adjusted." The term "adjusted" certainly does not mean "removed altogether." Instead, it actually implies that at least some sort of bonus would still be provided to Rogers, even if he was no longer in the position.  To the extent that the offer letter is ambiguous in this regard, it must be construed against the party who drafted it, i.e. HP. Civil Code § 1654. Further, unless there is no other possible interpretation, a contractual provision should not be construed so as to effect a forfeiture. *Milovich v. City of Los Angeles*, 42 Cal.App.2d 364, 373-374 (1941).

ii.    The 2014 employment agreement does not apply to the 2018 bonus

HP claims that if the 2016 offer letter does not bar the bonus for Rogers, then the 2014 employment agreement, (which provides that Rogers had to remain employed to receive his bonus for that particular position) provides an excuse for HP's failure to pay his bonus. However, the 2014 employment agreement provides for an entirely different bonus structure for a different position which Rogers had within the company. Rogers Dec III ¶16. If it did not, why would Mr. Eakins need to send a new offer letter to Rogers for the GM position in 2016?

Rogers was a GM at the time he earned his 2018 bonus and that he remained in that position until he left the company on January 18, 2019. Rogers Dec III ¶4. It is HP's position that the operative employment contract was the one in 2016. Thus, Rogers must have been subject to the bonus structure provided in the 2016 offer letter for the GM position, as is evidenced by that offer letter and his bonus payments received pursuant to the AIP plans for 2016 and 2017.

iii. The bonus was fully calculable on the date Rogers left HP

Rogers sent his final AIP plan numbers to Sindoni on January 3, 2019 with his resignation notice but did not leave the company until January 18, 2019. Rogers Dec III. ¶¶5,4. The numbers for his 2018 bonus were therefore calculable at least as of January 3, 2019, just as they were the previous two years. In fact, Sindoni testified "Dave would have known exactly what the actual performance was up through November" and estimated for December, and that Sindoni would have known too.  Sindoni Tr 123:24-25, 124:1-7 MG Dec §5. For 2017, the year before, Rogers was awarded a bonus which closely matched the amount on the AIP plan for that year. Rogers Dec III ¶17. There were no changes to the bonus structure for 2018. *Id.* Therefore, HP's assertion that the bonus for 2018 was far from final and unable to be paid timely upon Rogers' departure from HP is false and contradicted by Sindoni in his deposition. Sindoni Tr 123:24-25, 124:1-7.

### iv.   Others had left the company and still received their bonuses

Sindoni admits in his Declaration that other employees had left the company yet still received their bonuses. Sindoni Dec ¶12. Rogers is also aware of this occurring.  Rogers Dec III ¶25. Even more compelling, prior HR Manager James Maxwell declares that the year prior, HR Vice President Shawn Simmons had sent out an email to employees stating that anyone who was employed on the last day of 2017 would receive their 2017 bonus, and that this policy had not changed at the time Rogers left the company.  Maxwell Dec ¶¶5,6.Rogers had finished the 2018 year at the company and should have been paid his bonus.

### v.   Sindoni admitted the bonus was due

In the February 7, 2019 email to Rogers, Sindoni acknowledged that the bonus was due and owing to Rogers. Rogers Dec III ¶8. Ex.3. Further, HP's Sindoni admitted in his deposition that the dollar amount he provided in the release sent to Rogers in March 2019 was the "value of the bonus" that Rogers should have received for 2018. Sindoni Tr 60:17-19; 62:9-11, MG Dec ¶5.

## 2.   Waiting Time Penalties Are Due Since The Bonus was never paid

HP claims that waiting time penalties should not accrue due to its "good faith" belief that the bonus was not owed to Rogers. However, defenses presented, which under all of the circumstances are unsupported by any evidence, are unreasonable or are presented in bad faith, will preclude a finding of a good faith dispute. 8 C.C.R. §13520.

Here, The failure to pay Rogers' bonus was not only willful but unlawfully retaliatory. It appears that HP was at first willing to pay Rogers a portion of the bonus he earned for 2018 but if and only if he would sign a release giving up his legal rights as a former employee as well as the right to compete with HP.

Both Sindoni and James Maxwell have admitted under oath that other employees had been given their bonuses after leaving the company. It is thus

– 20 –

patently obvious that Rogers was treated much differently than the others. <u>HP did not withhold his 2018 bonus due to a good faith dispute about whether the bonus was owed to Rogers</u>. Instead, Rogers' bonus, after it was promised to him, was withheld in retaliation for his leaving the company and starting another competing company, and for his refusal to sign a release waiving his legal rights.

As Rogers has never been paid the bonus, and as it is undisputed that HP treated Rogers differently than other employees in bad faith with respect to his bonus payment, there are genuine issues of fact on this counterclaim as well.

### 3. Failure to Provide Accurate Wage Statements

Rogers' final paystub does not include the 2018 bonus, which as stated above, he earned and which he was entitled to receive from the company. Rogers Dec III ¶6. Accordingly, the company did not provide an accurate wage statement to Rogers as is required by law presenting a genuine issue of material fact.

## D. DEFENDANTS CAN PREVAIL ON THEIR RETALIATION COUNTERCLAIM

To allege a claim for retaliation, claimant must allege: (1) that he was engaging in a protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a causal link between his activity and the employment decision. *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). To demonstrate an adverse employment action, claimant must show that the alleged retaliatory acts "materially affect[ed] the compensation, terms, conditions, or privileges of ... employment." *Blount v. Morgan Stanley Smith Barney LLC*, 982 F. Supp. 2d 1077, 1082 (N.D. Cal. 2013). **Retaliation can continue even after the employment relationship has ended**; e.g., interfering with an individual's prospects for new employment by refusing to give a job reference or giving an unjustified negative reference, based on **a *retaliatory motive***. *Robinson v. Shell Oil Co.*, 519 US 337, 345-346 (1997) (emphasis added). Here, HP's intentional failure to pay Rogers' annual bonus on a timely basis was a

direct adverse employment action by HP in retaliation for Rogers' decision to resign from his position as AMS's GM and start his own company.

Each and every year he had been employed with HP, Rogers always received his annual bonus on a timely basis. Yet, upon his departure, HP failed to pay Rogers the earned 2018 bonus due and owing to him. This occurred even though HP's HR Manager Maxwell who was responsible for putting together a spreadsheet showing bonus information for employees recalled that David Rogers' name was on that sheet, showing that he would receive a bonus. Maxwell Dec ¶4.

In support of its MSJ, Plaintiff relies on Sindoni's assertion that it is Dover Food Retail's policy that an employee who departs the company before bonuses are calculated and paid will not receive a bonus for the previous year's work, but he admits exceptions have been made. Sindoni Dec ¶4. Also directly contradictory is Maxwell's further recollection that an e-mail sent by HP's Vice President of HR for HP, Shawn Simmons, stating that anyone who was employed on the last day of 2017, would get their bonus in 2018 and that this policy never changed. Maxwell Dec, ¶¶5-6; Rogers Tr. 75:10-25; Rogers Dec ¶ 21.

To date, the 2018 bonus still has not been paid. HP even attempted to obtain a release of Rogers' legal rights as well as new and extra agreements from him, including an "Affirmation of Continuing Restrictive Covenant Obligations" in exchange for some random amount as "Separation Payment," while not even offering to pay the bonus to which he was entitled as a portion of his earned wages. That HP asked Rogers to sign an additional restrictive covenant in exchange for payment of a reduced amount shows retaliation against him.

HP's decision to file the instant lawsuit on April 12, 2019, was a further continuance of HP's retaliatory pattern against Rogers for the purpose of inflicting maximum financial pain by forcing Rogers and Classic to defend against a frivolous lawsuit with baseless allegations. Others have left the company  under

similar conditions and not been sued.   Tuttle Dec ¶10. The sheer number of documents filed with the Complaint, the manufactured urgency of a TRO, the zealous pursuit of Rogers and his small company with false allegations, Sindoni's statement showing HP wants to make it difficult on Classic financially ( Kinman Dec ¶10), paying everyone their full bonus except for Rogers (Rogers Dec ¶22 ) all show HP's willful and malicious retaliatory conduct aimed at Rogers for leaving and starting his own company.

### E. **Genuine Issues exist regarding Counterclaims for Breach of Contract and Promissory Estoppel**

HP breached its contract with Rogers because it failed to pay him his bonus. Rogers' bonus was part of his compensation.  Rogers Tr. 79:20-22; 81:1-2. Sindoni himself testified that he relied on the self- assessment of his direct employees that were done on the AIP statements and that "Rogers would have known exactly what the performance was up through November" and estimated it for December and Sindoni himself would have known it too.   .  Sindoni Tr. 123:23-25, 124: 3-7. Sindoni also testified that he reviewed the performance with the employees monthly, quarterly and annually. Sindoni Tr. 122: 22-25; 123:1-2. And that the numbers estimated are fairly close to what the actual bonus will be.  Sindoni Tr. 112:13-23.  A bonus was due and fairly easily calculated, but HP failed to pay it to Rogers.  HP breached the employment contract with Rogers.

In addition to the promise of payment of a bonus based on reaching his goals in his employment agreement, Sindoni also wrote an e-mail to Rogers on February 7, titled it "Bonus" and in it promised: "Bonuses get approved with the board over the next couple of weeks.  Once they are, I will send over a document to sign for us to release the funds." Rogers Dec III ¶8.  This was a promise upon which Rogers reasonably relied and caused him damages. These are questions of fact for the jury.

### F. **Genuine Issues of Material Fact exist regarding the Interference Counterclaims.**

The litigation privilege does not protect statements made outside the courtroom to individuals who are unconnected to the litigation. *Begier v. Strom* 46 CA 4th 877, 882 (1996).  HP's assertion that the interference claims are based solely on the existence of this lawsuit is simply false.

Defendants allege that, among other things, Hill Phoenix "has done its best to drive Classic out of business" (Joint Answer and Counterclaims Dkt. 104 ¶42)("Counterclaim"), that its employees have been spreading rumors about Classic and its principals and, specifically, that John Patterson and Matt Franco showed copies of the TRO and the Complaint to the VP of Northgate Markets, telling him that Northgate was not supposed to do business with Classic (Counterclaims ¶¶ 117, 119, 127, 128.)   Rogers testified that certain of HP employees have been spreading rumors about defendants going to Jail. Rogers Tr. Pages 54 to 57, MG Dec ¶7.  These allegations are not barred by the litigation privilege because they allege facts more than just the filing of a lawsuit.  Further, the *Noer-Pennington* Doctrine which HP mentions without any analysis does not apply either.  HP falsely states, without any citation to any affirmative statement by Defendants, that Classic and Rogers "freely admitted that they cannot support any element of this claim."  No such admission was ever made.  Not only did Classic testify that it was informed by Northgate Market's project manager that they could not work with Classic based on Matt Franco and John Patterson's statements (Classic TR 52:4-10; 52:21-25), but HP's interference is further supported by Scott Kinman, who participated in a meeting at which Paul Sindoni said "[w]e know a lawsuit is difficult […] but we're going to make it as long as possible and as difficult on them financially." Kinman Dec. ¶10.  Classic has produced evidence of bids that it lost and evidence that Hill Phoenix is refusing to sell parts to Classic forcing Classic to reject installation or repair projects that require HP equipment. CLASS 132-137,148-149, 157-164, MG Dec ¶ 6.

HP's arguments fail as to calculation of damages. Evidence has been produced specifically as to Northgate Markets. Classic Tr. 109:2-112:10-113:1. HP states that an approximation of damages is insufficient.  However, "[t]he law requires only that some reasonable basis for computation of damages be used, and the damages may be computed even if the result reached is an approximation. *Meister v. Mensinger* 230 Cal. App.4th 381, 397 (2014). This is especially true where wrongful acts of [HP] have caused the other party not to realize a profit to which that party is entitled. *Id.* HP claims that Classic has no evidence of damages.  This is not true, the evidence has not been compiled yet but Ryan Nguyen, a forensic accountant states that lack of a long history of earnings does not preclude an expert from being able to compute a party's losses as a result of another's wrongdoing. Declaration of Ryan Nguyen, ¶ 22.

**Conclusion:**

HP has failed to carry its burden of establishing undisputed facts in regard to its claims and Defendants' counterclaims and the court should deny the motion.


Dated:  February 18, 2020          GHASSEMIAN LAW GROUP, APC



                                   By:    */s/ Mahyar Ghassemian*
                                          Mahyar Ghassemian
                                          Attorneys for Defendants,
                                          CLASSIC REFRIGERATION
                                          SOCAL, INC. and DAVID ROGERS


Dated:  February 18, 2020          HOFFMAN LEGAL CORPORATION



                                   By:    */s/ Paul A. Hoffman*
                                          Paul A. Hoffman
                                          Attorneys for Defendant,
                                          THOMAS DAVID LOWE

# PROOF OF ELECTRONIC SERVICE

I declare as follows:

I am over the age of 18 and not a party to the within action.  My business address is 27405 Puerta Real, Suite 250, Mission Viejo, CA 92691

On February 18, 2020, I caused to be electronically served a copy of the following document(s):  **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** via e-mail to the following persons noted below on the interested parties in Case No. 8:19-cv-695-DOC-JDEx, by electronically serving a copy of said document to:

1. Brian K. Brookey, Esq., Anthony D. Brosamle, Esq, Steven E. Lauridsen, Esq., and Valeria Golodnitska, Esq., counsel for Plaintiff:

   Brian K. Brookey, Esq.
   Anthony D. Brosamle, Esq.
   Steven E. Lauridsen, Esq.
   Valeria Golodnitska, Esq.
   **TUCKER ELLIS, LLP**
   515 South Flower Street, 42nd Floor
   Los Angeles, CA  90071

   E-mail:   brian.brookey@tuckerellis.com
   E-mail:   anthony.brosamle@tuckerellis.com
   E-mail:   steven.lauridsen@tuckerellis.com
   E-mail:   valeria.golodnitska@tuckerellis.com

2. Daniel J. Kelly, Esq., co-counsel for Plaintiff:

   Daniel J. Kelly, Esq.
   **TUCKER ELLIS, LLP**
   201 Mission Street, Suite 2310
   San Francisco, CA  94105

   E-mail:   daniel.kelly@tuckerellis.com

*/s/  Robin L. Root*

ROBIN L. ROOT